GUSTAVO CASANOVA, demandante y apelado, *v.* GONZÁLEZ PADÍN Co., INC., demandada y apelante.

No. 6247.—*Sometido:* Abril 6, 1934. *Resuelto:* Septiembre 29, 1934.

*C. Iriarte,* abogado de la apelante; *Diego O. Marrero* y *E. Font Suárez,* abogados del apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Versa este pleito sobre daños y perjuicios por injuria y

calumnia y arresto ilegal. Se falló en favor del demandante, declarando la corte probados los siguientes hechos:

"Ligia Laforet Carbonell y Gustavo Casanova vivían, unidos por vínculo matrimonial y con sus hijos, en su residencia de Santurce, calle Isern Núm. 33. El día 11 de octubre de 1930, siendo aproximadamente las dos de la tarde, llegó la Sra. de Casanova al establecimiento de la demandada González Padín & Cía., Inc., en gestión de compra de artículos para su uso personal. Se acercó a la sección en que se expenden prendas para el uso interior femenino y compró tres brassieres, por los cuales pagó al serle entregado el correspondiente ticket el precio de un dólar por cada uno—tres dólares ($3.00) en total. Compró, además, un brassiere de menos precio, valorado en cincuenta centavos, que pagó también después de habérsele entregado por su compra el correspondiente ticket.

"Al volver a la misma sección, desde aquélla en que se expenden trajes para niños y a la cual había ido con intención de comprar algo para sus hijos, con ocasión de examinar el último brassiere comprado, al efecto de comprobar si correspondía a la medida solicitada, una de las señoritas vendedoras de la corporación demandada le dirigió las siguientes palabras: 'Joven, haga el favor de ponerme el brassiere que me ha tomado ahí sin pagarlo.' Al contestar ésta dichas palabras, otra de las damas empleadas de la mercantil demandada intervino, haciendo más específica la imputación mediante el uso de la palabra 'robo' dirigida a la señora esposa del demandante, quien, ante esta última manifestación contestó que nada había robado, pues había pagado todos los artículos que tenía en su cartera. Fué requerida entonces por una de las expresadas empleadas de la demandada para entregar la cartera, mediante amenaza de que si no lo hacía así serían llamados los jefes de la casa, a lo cual la señora de Casanova manifestó que no entregaría la cartera a persona alguna que no fuera a su esposo.

"En este momento intervino el señor Emilio J. Noya, miembro de la Junta de Directores de la mercantil demandada, e inspector, entre otras funciones, del movimiento comercial en los distintos departamentos de dicha mercantil, quien se acercó con un policía al sitio donde estaba trabada la discusión, interviniendo en ésta el policía, de nombre Emilio Fernández, a quien trajo al establecimiento el expresado señor Noya, por orden del señor Manuel Álvarez, director también de la mercantil demandada y gerente general (General Manager) de la misma, para intervenir en el asunto y prestar el servicio necesario. El señor Noya preguntó públicamente a la empleada

que originó el suceso, si ya había la expresada señora pagado el precio del artículo tomado, a lo que la empleada contestóle negativamente, con lo que quedó una vez más ratificada, por un tercer funcionario de la mercantil demandada, la imputación inicial de robo contra la esposa del demandante. (Declaración de la Srta. Vad.) En este momento el señor Álvarez invitó a la Sra. de Casanova para pasar con él a otro sitio, y entonces utilizando el ascensor del establecimiento subió la expresada señora, con el señor Álvarez y otras personas más al piso ocupado por el departamento de muebles. Requiriósele allí nuevamente por funcionarios de la demandada para que entregase la cartera en que guardaba el objeto robado, pues de lo contrario sería arrestada, a lo que la señora volvió a negarse, suplicándoles, por favor, que llamaran a su marido para entregarla a él, informando la dirección a que podían llamarle.

"El requerimiento continuó en forma insistente, aún por el policía Fernández. En todas las ocasiones en que se le hizo la señora de Casanova repudió la imputación de robo y pidió que hiciesen venir a su marido para entregar a él la cartera manifestando que era una señora honrada, de familia buena, y que no iba ella a manchar a su marido y a sus hijos. A esto se le contestó siempre, por los representantes de la demandada, que todos los que se encontraban en situaciones similares decían así, ordenando entonces el señor Álvarez al Sr. Noya que acompañase al policía y a la señora de Casanova hasta el Cuartel. Cuando el señor Fernández, policía insular que allí actuaba, manifestó a dicha señora Laforet que la conduciría hasta el cuartel, insistió ésta nuevamente en su inocencia y en que llamasen a su esposo, recibiendo otra vez más la negativa a su petición. Entonces fué llevada en el ascensor hacia la parte baja del edificio y conducida, ya arrestada por el policía y por el Sr. Noya, quien obedecía órdenes del Sr. Álvarez, por las calles de la ciudad comprendidas entre el establecimiento mercantil de la demandada y el cuartel local de la policía insular.

"Desde que el incidente surgió, en la sección de ropa interior para damas, en el establecimiento mercantil de la demandada, hasta que abandonaron el establecimiento en camino hacia el cuartel, se reunió numeroso público que presenció la discusión y que se informó de la imputación que se hacía a la señora esposa del demandante, formándose en las calles recorridas un núcleo mayor de personas, que iba detrás de ésta y de quienes la conducían hasta el cuartel, curioseante de lo ocurrido.

"En el cuartel de la policía la demandada fué nuevamente re-

querida para entregar su cartera, tanto por oficiales de la policía insular y por empleados de la demandada, como por personas que amigablemente se aprestaron a persuadirla para ello, negándose siempre la esposa del demandante a entregarla a otra persona que no fuera su esposo, a quien pedía insistentemente localizasen para terminar la detención de que era objeto. Posteriormente, y cercanas ya casi dos horas de su detención en el cuartel de la policía insular de San Juan, en donde se encontraba por el arresto que de ella hizo el policía Emilio Fernández, llegó al cuartel el demandante señor Casanova, a quien entonces hízole su esposa entrega de la cartera habiendo estado hasta este momento dicha señora, desde que surgió el incidente, bajo la observación continua de empleados de la demandada. Entonces, ya en presencia de su esposo, del señor Ángel Umpierre, Juez Municipal de Toa Alta, actuando por aquella época, en San Juan, del capitán de la policía y de distintos abogados y oficiales del expresado cuerpo, se procedió a abrir la cartera y se encontró en su interior, efectivamente tres brassieres de igual calidad y un brassiere menos fino que los primeros, más dos boletas de venta expedidas por la corporación demandada el mismo día 11 de octubre, demostrativas de un pago en efectivo (*cash*), de tres dólares por tres brassieres a razón de un dólar cada uno, correspondientes al departamento de ropa para señoras, y otra boleta expedida por la corporación demandada el propio día 11 de octubre demostrativa de un pago en efectivo de cincuenta centavos (50¢), por un brassiere correspondiente también al mismo departamento, en el cual había comprado y pagado dichos artículos la señora de Casanova.

"Luego de esto, el Juez Municipal, Sr. Umpierre, practicó y redujo a escrito una investigación de los hechos, llegando a la conclusión de que no se había realizado delito alguno por la esposa del demandante, quien, ya cercana la noche quedó en libertad para dirigirse a su domicilio, tras la inmensa angustia y la abrumadora vergüenza que todo ello le produjo, y a las cuales fué sometida por la acción culpable y carente de toda justificación, que, iniciada y sostenida por los empleados y agentes de la corporación demandada en el cumplimiento de sus funciones, desarrollóse en la forma precedentemente expuesta.

"Con tendencias a destruir la prueba de esos hechos fundamentales presentada por el demandante, intentó la corporación demandada, dentro de los términos meramente negativos de su contestación, demostrar que ocurrieron ellos de manera distinta. Y al efecto esforzóse por establecer que la Srta. Vad lo único que intentó, al surgir

el incidente, fué que la Sra. de Casanova le entregase el brassiere tomado para empaquetarlo; que ésta confesó efectivamente haber cogido dicho artículo sin haberlo pagado, y que si fué dicha señora conducida al cuartel de la policía insular debióse a su propia petición para que así se hiciese.

"Un examen sereno, sin embargo, de la evidencia presentada para sostener tales hechos, lleva inevadiblemente a la conclusión de que no quedaron los mismos debidamente establecidos, y de que, en contrario, fué la evidencia ofrecida en su apoyo adversa totalmente a la demostración de su ocurrencia."

Sigue el juez analizando la evidencia de la parte demandada y luego dice:

"Éstas y otras consideraciones de riguroso análisis, unidas a la impresión que personalmente le produjo el desfilar de toda la evidencia en el caso, llevan al juzgador a declarar que no ocurrieron, en su opinión, los hechos, como intentó demostrarlos la mercantil demandada, y declarar probado, en contrario, que, por un lamentable error de los agentes y representantes de la demandada, en el curso de dicha agencia y representación, la Sra. Ligia Laforet de Casanova, fué objeto de una pública imputación de hurto que éstos contra ella hicieron, sin que les constara la certeza de dicha imputación, a virtud de la cual y a instancias de los mismos, fué la expresada señora indebida e ilegalmente arrestada y privada de su libertad en la tarde del día 11 de octubre de 1930."

No conforme la demandada con la sentencia que contra ella se dictara, apeló para ante este tribunal, señalando en su alegato la comisión de tres errores como sigue:

"1.—La corte erró al concluir que hubo una preponderancia de prueba a favor de la parte demandante.

"2.—La corte erró al considerar que la ley está a favor de la demandante y en contra de la demandada.

"3.—La corte erró al conceder a la demandante una indemnización de $10,000, la cual es excesiva y fuera de toda proporción a los daños generales alegados en la demanda."

A nuestro juicio no existe el primero de los errores señalados. Hemos estudiado cuidadosamente toda la evidencia presentada y hemos tomado en consideración todos los argumentos que contiene el alegato de la parte apelante

impugnando la declaración de hechos probados que dejamos transcrita y al final de nuestro examen hemos concluído una y otra vez que la declaración impugnada encuentra apoyo en la prueba sin que pueda sostenerse que el juez al resolver el conflicto en la misma existente actuara movido por pasión, prejuicio o parcialidad o cometiera algún error manifiesto.

Es cierto que hemos vacilado al analizar la declaración del testigo del demandante Vicente N. Quiñones y al tratar de penetrar en el porqué de su intervención en este pleito, pero al volver a leer y a pesar la declaración de la ofendida nos ha parecido tan lógica, tan firme y tan sincera que nos explicamos perfectamente la decisión del juez sentenciador al darle crédito. Los hechos hablando por sí mismos y la propia prueba de la parte demandada analizada en detalle y en conjunto justifican además el fallo recurrido.

No es posible admitir que si la esposa del demandante confesó ante empleados y directores de la demandada y ratificó ante el propio policía que la arrestó que había cometido el delito que se le imputara, y que si Noya, director de la demandada, se dirigió al cuartel con el único propósito de hacerse cargo de los brassieres hurtados, instruído el proceso terminara en el acto por falta de base, la esposa quedara exonerada y el Director regresara a su comercio sin los brassieres y nada más gestionara. Y fué que al abrirse la cartera quedó plenamente demostrada la falsedad de la imputación.

Tampoco es posible armonizar la insinuada existencia de una trama expresamente preparada para establecer este pleito con la confesión de culpabilidad de su crimen por parte de la persona que tenía que basar su caso en su inocencia.

La clave de todo lo ocurrido quizá pueda encontrarse en el hecho que revelan ciertas palabras que la testigo del demandante María Luisa Mercado escuchó pronunciar al director de la demandada Noya cuando se dirigía por las calles

de San Juan en unión del guardía Fernández y de la esposa del demandante hacia el cuartel de policía. Dijo la testigo:

". . . cogieron por la calle de San Francisco y yo seguí detrás y oí que varias personas le preguntaban al señor Noya qué pasaba y él decía: 'Lo mismo de siempre, por robo.'"

"Lo mismo de siempre," el hecho de las muchas sustracciones de que al parecer ha sido víctima la demandada en su establecimiento mercantil, la hizo tal vez actuar con ligereza, sin respeto a la personalidad humana, ni piedad para con una mujer, lanzando sin cerciorarse de su absoluta verdad la imputación e induciendo a la práctica del arresto por el policía que ocasionaron a la esposa del demandante la vergüenza, el dolor, los trastornos físicos y morales y la enfermedad que surgen de la prueba y de la propia condición de la naturaleza humana.

Si en vez de lanzarse los dependientes de la demandada primero y sus directores después a imputarle la comisión de un delito, hubieran tratado de comprobar sus sospechas sin ofenderla, accediendo por lo menos a su insistente ruego de que se llamara a su esposo, quizá se hubiera todo evitado. El prejuicio se impuso e impulsó a dependientes y directores a actuar en la forma en que lo hicieron.

En el segundo error se discuten las tres proposiciones que siguen:

"La publicidad es un elemento esencial de la calumnia, que no quedó establecido en este caso.

"Las corporaciones no son responsables por los actos de 'sus agente o empleados, a menos que sean ejecutados dentro del curso de su empleo y en el cumplimiento real y efectivo de sus deberes, o que tales actos sean autorizados o ratificados expresamente.

"La malicia y la falta de causa probable son elementos esenciales en este caso."

Existe el elemento de publicidad. La imputación se hizo públicamente en el establecimiento de la demandada en uno de sus departamentos de venta, se repitió en el sitio a que

fué conducida la esposa del demandante y se reiteró en la calle. Fué no sólo pública, si que notoria.

Tanto la dependiente Srta. Vad como la Sra. Blanco, encargada del departamento, y los directores Noya y Alvarez, el primero cajero, director y *floor worker* de la demandada y el segundo director y administrador general de la misma, actuaron según demuestra la prueba dentro del radio de su empleo, dentro de la esfera de sus atribuciones, obligando por tanto con sus actos a la demandada.

"Hoy en día ha quedado plenamente establecido," dice la Corte Suprema de los Estados Unidos en el caso de *Lake Shore & Michigan Southern R. R.* v. *Prentice,* 147 U. S. 101, 109, "que en acciones basadas en actos torticeros puede hacerse responsable a una corporación por los daños y perjuicios ocasionados por los actos de sus agentes en el curso de sus deberes oficiales."

█ La malicia se presume en casos como en éste en que se imputa la comisión de un acto constitutivo de delito a un extraño.

La misma Ley para autorizar pleitos por daños y perjuicios ocasionados por libelo y calumnia de 1902, Código de Enjuiciamiento Civil, Ed. 1933, p. 308, en su sección 5 dice:

"Se presumirá que existe malicia en cualquier comunicación o escrito infamatorio o calumnioso que se dirija a otra persona que no sea un pariente dentro del tercer grado, o a una persona a quien el autor tenga bajo su tutela, o cuando dicha comunicación se cruce entre personas que tengan negocios en sociedad, u otra asociación semejante."

Y la jurisprudencia expresa:

"Por regla general imputarle a una persona verbalmente el delito de hurto da de por sí derecho a entablar un litigio." 36 C. J. 1204.

"Se ha resuelto universalmente que en acciones basadas en la difamación de una persona, cuando las palabras dichas son procesables de por sí, se presume concluyentemente la malicia." 17 R.C.L. 322.

"Es regla general que cuando en una publicación difamatoria se

usan palabras que sean libelosas *per se,* la presunción de malicia existe contra el autor de la comunicación, presumiéndose en tal caso la existencia de los daños y perjuicios; . . ." *Jiménez* v. *Díaz Caneja,* 14 D.P.R. 9.

"La publicación de materia difamatoria procesable de por sí da derecho a la persona difamada a obtener indemnización por los daños y perjuicios realmente ocasionádosle irrespectivamente del motivo con que se hizo la publicación; la falta de intención de perjudicar a otro no es excusa legal. La intención no desempeña papel alguno, por lo menos cuando no se alegan daños punitivos (*exemplary damages*). Se ha resuelto que se presume la intención concluyentemente.

"Las decisiones han afirmado y negado que la malicia es un elemento necesario o el nervio de una acción por haberse difamado a una persona. Los criterios encontrados en realidad no crean divergencia en el derecho sustantivo sobre difamaciones, toda vez que su efecto último es idéntico. La palabra 'malicia' en la ley sobre difamación puede ser usada para denotar meramente la ausencia de una excusa legal, o sea, malicia implícita o malicia en derecho o puede ser usada como una palabra que conlleva una intención de la mente y del corazón, procacidad contra una persona, es decir, malicia real o malicia efectiva. Mas de ordinario cuando la parte demandante trata de obtener indemnización por concepto de daños generales tan sólo se hace referencia a la malicia legal o implícita y no a aquella malicia que envuelve odio o mala voluntad y por ficción de derecho tal malicia está implícita o se presume existir cuando se publican palabras difamatorias no privilegiadas que son procesables de por sí, y no es necesario que se establezca malicia real o expresa a fin de que la parte perjudicada pueda obtener indemnización por los daños y perjuicios sostenidos al publicarse una imputación no privilegiada que es difamatoria de por sí, a menos que el estatuto disponga lo contrario. La ausencia de malicia expresa no constituye defensa." 36 C. J. 1214 y 1215.

 El arresto existió. El policía intervino a requerimiento de la demandada. Esta, por medio de uno de sus directores, amenazó con el arresto a la señora del demandante si no entregaba la cartera y en efecto la señora fué llevada al cuartel por el policía acompañada de otro de los directores de la demandada, y estuvo en el cuartel privada de su libertad hasta que el juez municipal investigó el caso y reconoció su inocencia.

Dice el artículo 241 del Código Penal:

"Entiéndese por prisión ilegal el acto de restringir ilegalmente la libertad de alguna persona, bien reteniéndola en algún local destinado generalmente a la reclusión de presos, o usado sólo en tal ocasión, bien por medio de palabras y el alarde de fuerza, sin cerrojos ni barras, en cualquier lugar."

Y la jurisprudencia expresa:

"Entiéndese por prisión ilegal el acto de restringir ilegalmente a una persona contra su voluntad o libertad de acción personal. La médula del delito de prisión ilegal la constituye la detención ilegal." 25 C. J. 443.

"Un arresto ilegal," se dice en el caso de *Strain* v. *Irwin*, 70 So. 734, 736, "es técnicamente y de hecho una prisión ilegal, y la alegación adicional del encarcelamiento (*imprisonment*) no es esencial para que se aduzca una causa de acción de acuerdo con el código, formulario 19, p. 1198. Tampoco la alegación relativa a la duración del encarcelamiento tiene otro efecto que el de ser una orden directiva toda vez que ella se refiere meramente al alcance de los daños y perjuicios; y una detención momentánea, de ser ilegal, da derecho a una causa de acción absoluta. 19 Cyc. 325."

"No hubo malicia," expresa la Corte Suprema de Michigan en el caso de *Maliniemi* v. *Gronlund*, 52 N. W. 627, 628, "en la actuación de Gronlund y la corte así lo informó al jurado; a no ser por el arresto y por el consiguiente daño ocasionado a la parte demandante, el demandado era claramente responsable con vista de la prueba aducida por el demandante y de las autoridades. De no haber sido por el demandado el demandante nunca hubiese sido arrestado o encarcelado. Todo el período del encarcelamiento del demandante fué la consecuencia natural de los actos realizados por el demandado. Según la declaración del demandante el demandado hizo más que comunicar simplemente los hechos y las circunstancias de su sospecha al funcionario y dejar que éste actuara de acuerdo con su mejor criterio. El funciona-

rio, que no ha declarado en este caso, actuó evidentemente a instancias de Gronlund y muy bien puede decirse que el demandado ordenó el arresto. Un particular tiene derecho a arrestar a una persona por sospechas de un delito grave sin necesidad de orden de arresto; pero si lo hace así y resulta que se ha arrestado a un hombre que no ha cometido delito alguno, tal persona debe estar preparada para justificar su actuación—primero, que se cometió un delito grave; y segundo, que las circunstancias en que actuaba la persona arrestada fueron tales que cualquier persona de ordinario entendimiento, exenta de pasión o prejuicio, hubiese lógicamente sospechado que el demandante lo cometió o que estaba envuelto en el mismo. 2 Add. Torts, 803, y casos citados.''

Aquí se actuó bajo una mera sospecha sin causa justificada para ello. La circunstancia de que después de verificada la compra volviera la esposa del demandante al departamento en que la verificara para cerciorarse de si el número del brassiere últimamente comprado era correcto y a tal efecto abriera su cartera para examinarlo, no justifica la actitud de las empleadas de la demandada y los actos posteriores de sus directores. Tampoco estaba obligada la esposa del demandante a abrir su cartera en la forma que le imponía la demandada. Pudo hacerlo y el hecho no hubiera tomado seguramente las proporciones que tomó, pero el que no lo hiciera no justifica la conducta de la demandada. Su petición de que se llamara a su esposo era razonable y la demandada que pudo llamarlo y evitar también con ello que el incidente tomara las proporciones que tomó, no lo hizo. Parece conveniente transcribir aquí lo que sigue de la declaración de la esposa. Dice:

"Señalando al Sr. Álvarez. Entonces aquel señor, en muy buenas palabras me dijo: 'Joven, Ud. quiere pasar conmigo a la oficina?', y como ví que fué el único que no me ultrajaba, creí que me iba a ayudar en aquel momento, y lo seguí, pero como no conozco los sitios, sé que me subieron en un ascensor y como él me había dicho que me llevaría a una oficina, subí en el ascensor, pero no me llevaron a la

oficina. Cuando apeé del ascensor me encontré en un sitio que no había nada más que muebles y un solo hombre limpiando. Al verme allí, me dió una impresión bárbara y pensé en muchísimas cosas.

"Entonces este señor grueso me cogió por el brazo y me dijo: 'Joven, entregue la cartera si no quiere que la arreste.' Le dije que no podía entregar la cartera, que por favor llamaran a mi marido allí, que después que viniera mi marido yo entregaba la cartera; le rogué que lo llamara y le dí la dirección y el señor me contestó que no había marido ni familia, que lo que quería era la cartera y los objetos que yo me había robado. Y yo le dije: 'Créame que no he robado, solamente no entrego la cartera porque tengo necesidad que venga mi marido a esta habitación donde estamos solos.'

"Yo no podía más; uno me llevaba para este lado, otro me decía: 'Entréguela,' el policía también, 'entregue la cartera, que si Ud. ha hecho algo malo yo no la arresto.' Solamente quería que llegara en ese momento mi marido. Y yo les decía: 'Yo soy una señora de buena familia aquí, honrada y que nunca he tenido ninguna mancha, y no voy a manchar a mi marido y a mis hijos' y entonces este señor dijo que así decíamos todas las que íbamos allí y yo le dije que no había robado y que no entregaba la cartera si no venía mi marido. Y entonces le dijo este señor a Noya: 'Noya, haga el favor de acompañar a este policía al cuartel y a esta joven.'

"Cuando el policía me dijo que me llevaría al cuartel, le dije que no me llevara, que llamara a mi marido, que yo era honrada, que no había robado, pero él no quiso. Entonces me bajaron en el mismo ascensor, y llegué a la puerta de la esquina, y cuando llegué allí, no me dí más cuenta. Solamente oía que el policía decía: 'Atrás! . . . Atrás! . . . Atrás! . . .' y nada más."

■ Resta sólo considerar el tercer error o sea el que se refiere a la cuantía de los daños y perjuicios.

A los daños refiriéndose dijo el juez de distrito:

"Antes del suceso la señora Casanova era una mujer que gozaba de buena salud. Luego del suceso sufrió su organismo una grave, profunda y total alteración. Fiebres intensas, vómitos, frecuentes en exceso; dolor intenso en la cabeza, el pecho y el estómago; deseos e imposibilidad de llorar; sensación de fluctuaciones notables en su temperatura; trastornos, que aún perduran, en las manifestaciones periódicas de su feminidad; extrema sobreexcitación nerviosa; obsesión mental con el incesante recuerdo del escándalo que la llevó a

pensar en el suicidio para no ser viviente causa de la deshonra de su esposo y de sus hijos, hasta el punto de ser considerada, por su manía suicida, como un peligro para sus mismos hijos y su esposo; sometimiento a intervenciones facultativas; reclusión en cama; mudanza a distintos sitios, algunos de ellos apartados de toda relación social; horror a enfrentarse con sus amistades; aislamiento voluntario por temor a que se creyese cierta la acusación; angustia espiritual, dolor moral, vergüenza; manifestaciones todas que pueden ocurrir y que en este caso ocurrieron, como consecuencia de un fuerte *shock* emotivo o golpe moral intenso que ponga en peligrosa conmoción, angustiando el espíritu, la estructura anímica de cualquier persona.

"¿Cuáles de esos daños fueron ocasionados por la calumnia? ¿Cuáles por el arresto ilegal? Se hace sumamente difícil, por la naturaleza especial del caso, distinguirlos. Hay entre ambas causas de acción relación tan estrecha, que, aun cuando no son jurídicamente confundibles en su esencia, sólo lo son en sus alcances. Juzgando, empero, los hechos en su totalidad, sería arbitraria toda diferenciación que diera más importancia a los daños y a los perjuicios ocasionados por cualquiera de ambas causas de acción. Y entendiéndolo así, la Corte es de opinión que la esposa del demandante ha sufrido, en conjunto, y que deben serle resarcidos por la demandada, daños que es razonable fijar, cuenta habida de todas las circunstancias envueltas en la acción, en la suma de $10,000.00 distribuídos así: $5,000.00 por la primera y $5,000.00 por la segunda causa de acción, incluída en esta suma la cantidad reclamada por gastos de materiales, opinando, además, que la demandada debe satisfacer también las costas, desembolsos y honorarios de abogado en que haya incurrido el demandante para sostener la presente acción."

Ambas partes citan numerosos casos para sostener la apelante que la cuantía fijada es excesiva y el apelado que aun pudo ser mayor.

Es difícil determinar la exacta cantidad que procede en justicia en casos de esta naturaleza. Apreciando, sin embargo, todas las circunstancias concurrentes, nos parece que *la sentencia debe modificarse fijando la indemnización en cinco mil dólares. Y así modificada, confirmarse.*