JORGE F. ROMANY, demandante y recurrido, *v.* EL MUNDO, INC., demandada y recurrente; JORGE F. ROMANY, demandante y recurrente, *v.* EL MUNDO, INC., demandada y recurrida.

*Números:* R-63-11, R-63-14      *Resueltos:* 17 de diciembre de 1963

*José F. Quetglas Álvarez,* abogado de Jorge F. Romany; *Rivera Zayas, Rivera Cestero & Rúa,* abogados de El Mundo, Inc.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

El Juez Asociado Señor Santana Becerra emitió la opinión del Tribunal.

En la edición final del periódico El Mundo correspondiente al jueves 25 de mayo de 1961, Núm. 15496, se publicó en primera página una información relacionada con actos cometidos por el Lcdo. Frank Abella Blanco. La información aparece bajo el siguiente título que cubre dos columnas: "Acusan a Abogado Herir a Tiros a Dos Socios." En el extremo superior izquierdo de la información y a nivel de su título aparece una fotografía del Lcdo. Jorge F. Romany que cubre un espacio de 1–5/8 pulgadas de ancho por 3 pulgadas de alto de la columna. Debajo de dicha fotografía aparece el nombre Frank Abella Blanco identificando la misma. La tercera parte inferior de la fotografía representa el cuerpo del Lcdo. Romany hasta los hombros. Casi todo el resto repre-

senta su rostro. En la fotografía el Lcdo. Romany aparece con unas gafas negras de un tamaño un tanto mayor que el tamaño corriente de los espejuelos de lectura. Las gafas no permiten distinguir sus ojos en el retrato.

La información en sí cubre una sola columna que empieza a la altura de poco más de la mitad del retrato, que le queda a la izquierda, y comienza así: "El Lcdo. Frank Abella Blanco, fue acusado ayer por la tarde de dos casos de ataque para cometer asesinato, posesión y portación ilegal de armas por las heridas de bala recibidas en horas de la mañana por sus dos socios en la Santurce Soda Water, José Seraballs Salot, y el padre de éste Pedro Seraballs Aulet." Sigue la información exponiendo que el acusado tiene 47 años de edad y reside en el sector de Punta Las Marías en Santurce y que se presentó en la Fiscalía de Distrito de San Juan acompañado de un abogado, mientras la Policía hacía gestiones para localizarlo en distintos puntos de la Capital; que las acusaciones le fueron formuladas por el Juez Superior Baldomero Freyre quien le fijó fianzas montantes a $12,000 para su libertad provisional después que el Fiscal Zoilo Dueño González preparó el expediente del caso; y que se supo que Abella Blanco prestó en el acto las fianzas exigidas. Que la investigación realizada establecía que el Lcdo. Abella Blanco hirió a los señores Seraballs como culminación de una serie de discrepancias entre los tres socios por cuestiones de negocios; que el suceso ocurrió en las propias oficinas de la Santurce Soda Water donde Abella y sus socios celebraban una reunión para tratar la compraventa de su negocio; que se alegaba que el acusado discutió acaloradamente con José Seraballs, administrador de la firma, y utilizando una pistola calibre 22 hizo un primer disparo contra el Sr. Pedro Seraballs y que luego hizo dos disparos contra José Seraballs alcanzándolo con uno de ellos en la cabeza, de gravedad. Continúa la información exponiendo que según declaración de Pedro Seraballs ante el Fiscal, el Lcdo. Abella, luego de cometer los hechos salió por

la puerta principal de la oficina a la cual le puso un cerrojo por la parte de afuera y minutos después unos empleados de la fábrica encontraron a los señores Seraballs heridos y los condujeron al Hospital de Distrito de Río Piedras; que en la institución se informó que el estado del Sr. José Seraballs era grave y se le estaba sometiendo a operaciones de emergencia; que los señores Seraballs residían en el barrio Frailes de Guaynabo y que con anterioridad a estos hechos la Policía de Puerto Nuevo había recibido una querella del Lcdo. Abella Blanco en la cual éste se quejaba de ciertas actuaciones de su socio José Seraballs. Hasta aquí la información aludida. Menciona al Lcdo. Abella Blanco por su nombre en 6 ocasiones. No menciona la información al Lcdo. Romany en momento alguno.

En la primera edición del periódico El Mundo correspondiente al viernes 26 de mayo de 1961, Núm. 15,497, aparece una información en primera página en la tercera columna y más o menos de la mitad del periódico hacia abajo, en un cuadro bajo el título "corrección" que reza así:

"Por un error que El Mundo lamenta de veras, en la Edición Final apareció, en primera página, una fotografía del Licenciado Jorge Romany identificada con el nombre de Frank Abella Blanco.

"La fotografía fue tomada en la Fiscalía antier, cuando se investigaba al Licenciado Abella Blanco en relación con la agresión a balazos de los señores José Seraballs Salot y Pedro Seraballs Aulet.

"El Licenciado Jorge Romany se hallaba en fiscalía como abogado que es del Licenciado Abella Blanco.

"El Licenciado Jorge Romany es conocido en los círculos profesionales y sociales de Puerto Rico y es persona que goza de la más alta estimación de los hombres de esta Casa."

El tipo usado en esta "corrección" es más pronunciado o mayor que el tipo de la materia informativa de las columnas que la rodean, y entre las líneas típicas que dividen las columnas y los márgenes laterales de la "corrección" hay un espacio

en blanco de 1/4 de pulgada a cada lado y así la "corrección" objetivamente se destaca.

En esa misma edición primera del 26 de mayo de 1961, pero en su página 36, se reproduce la información dada por el Periódico en la edición final del día 25 en forma idéntica, sólo que la fotografía del Lcdo. Romany queda ahora en el extremo superior derecho y bajo la fotografía, identificándola, aparece lo siguiente: "El Licenciado Jorge Romany, abogado del Licenciado Frank Abella Blanco." En el mismo número 15,497 de 26 de mayo de 1961, ahora en su edición final, se reproduce la nota de "corrección" antes transcrita, en forma idéntica, sólo que ahora aparece situada también en la primera plana pero en la séptima columna de la mitad del periódico hacia arriba. (¹)

El Lcdo. Romany interpuso demanda de daños en la Sala de San Juan del Tribunal Superior contra El Mundo. Después de exponer ciertos hechos de fondo que fueron admitidos, alegó que la publicación, "aunque era cierta en cuanto a los hechos expuestos en la noticia, se refería a otra persona, también abogado, y no se refería al demandante y debido a la negligencia de la demandada hizo circular en su primera (*) edición de ese día la fotografía del demandante quien es también abogado y ejerce su profesión en la Isla de Puerto Rico." En la alegación octava se expuso "que con motivo de la negligencia de la demandada y sus empleados el

---

(¹) En el récord no hemos encontrado evidencia de la hora exacta en que empiezan a circular la primera y la segunda edición de El Mundo. Sin embargo, es un hecho familiar que la primera edición del número correspondiente a un día está en circulación en la tarde del día anterior, y la segunda en la mañana de ese mismo día. El retrato del Lcdo. Romany identificado como Frank Abella Blanco circuló en la mañana del jueves 25 de mayo de 1961; en la tarde de ese mismo día circuló el número del viernes día 26 con la nota de corrección y reprodujo la información y el retrato, esta vez identificándolo como el Lcdo. Jorge Romany, abogado del Lcdo. Frank Abella. En la edición final del 26 que circuló en la mañana del propio día volvió a aparecer la nota de corrección también en primera plana.

(*) Fue la segunda.

demandante fue víctima de bromas de mal gusto, se le expuso al ridículo público", y en la décima, "que aunque la demandada en su edición del 26 de mayo de 1961 rectifica su negligencia y error cometido con una nota donde aclaraba los hechos, dicha rectificación no se hizo en la forma debida ya que no se acompañaba la fotografía del demandante en la rectificación expuesta." Aparentemente, esta acción se asentó en un supuesto de negligencia y de error por parte de la demandada que causó daños al demandante. La posición de la demandada fue que actuó por inadvertencia y no por negligencia.

Aparte de lo expuesto al principio tomado de la prueba documental admitida en evidencia y que son las ediciones pertinentes de El Mundo, la Sala sentenciadora determinó lo siguiente como cuestión de hecho:—(1) que la fotografía fue tomada por el fotógrafo de El Mundo, Inc. Sr. Luis Casenave, el día 24 de mayo de 1961 en horas de la tarde en la Fiscalía de Distrito de San Juan, en ocasión que el Sr. Abella Blanco era investigado en relación con disparos que había hecho contra sus socios de una empresa comercial. El Lcdo. Jorge F. Romany se encontraba en Fiscalía junto al Lcdo. Celestino M. Iriarte, Jr. acompañando al amigo de ambos, Lcdo. Abella Blanco; (2) que la fotografía fue tomada mientras se investigaba al Lcdo. Abella Blanco en relación a la agresión a balazos contra los Sres. José Seraballs y Pedro Seraballs Aulet; (3) que como consecuencia de la publicación de la fotografía del demandante "identificándosele como acusado de haber cometido delitos de agresión a balazos", éste fue objeto de bromas pesadas por amigos y conocidos en sitios públicos y ante terceras personas no conocidas por el demandante; (4) que recibió numerosas llamadas telefónicas tanto en su hogar como en la oficina relacionadas con el incidente expuesto, lo que le causó graves trastornos, incomodidad y angustias tornándose huraño y molesto al encontrarse por varios días con su tranquilidad perturbada por el in-

cidente y las consecuencias resultantes; (5) que un mes después de la publicación y en la "Cafetería Manolín" en San Juan, Puerto Rico, el Sr. Octavio Costas, conversando con el Lcdo. Antonio Castro Fernández, y creyendo que el demandante quien estaba allí presente era el Lcdo. Abella Blanco, "se refirió sobre el demandante como una 'persona tan tranquila a pesar de haber matado a uno.' " Ello le causó gran angustia al demandante y honda perturbación mental, al ser enterado del incidente.

Como cuestión de derecho la Sala sentenciadora resolvió el caso bajo las disposiciones de ley aplicables al libelo. Consideró ésta como una publicación libelosa *per se* que llevaba consigo el elemento de malicia por imputarle a un extraño la comisión de un acto constitutivo de delito público. Concluyó que el demandante no venía obligado a probar malicia por parte de la demandada ya que ella surgía "de la forma negligente y festinada del acto de la demandada al tomar una fotografía de una persona y sin cerciorarse de la identidad de la misma, publicarla relacionándole con acusación de crimen." Que la publicación resultaba libelosa *per se* y falsa "por razón de error en identificar, nombrar o describir al demandante como la persona a la cual se refiere la información publicada" y que aun cuando la información fuera privilegiada de no haber ocurrido error en la descripción o identificación del demandante, como la persona a la cual se refería la información, "la falsedad de la publicación, en cuanto al demandante, la hacía una libelosa *per se*." A la luz de esas conclusiones declaró con lugar la demanda, como publicación libelosa, y considerando que los daños quedaron mitigados en parte por la corrección publicada, condenó a la demandada a pagar una indemnización de $8,000 más $1,000 por concepto de honorarios de abogado.

Ambas partes interpusieron recursos de revisión. El demandante en cuanto a la cuantía por entender que la Sala sentenciadora debió haber tomado conocimiento judicial de todos

los daños que la publicación pudo causarle aun cuando el demandante no presentara prueba de todos y cada uno de los actos específicos, consecuencia de la publicación. La demandada ataca la sentencia por ser contraria a la prueba y los hechos ocurridos y, por exagerada, la cuantía de los daños concedidos.

En cuanto a lo que sucedió en la antesala de la oficina del Fiscal Dueño, la prueba es conflictiva. La Sala sentenciadora no hizo conclusiones de hecho pormenorizadas sobre lo allí ocurrido, y conviene hacer un resumen de la prueba en el récord a este respecto. El demandante Lcdo. Romany declaró que como a las cuatro y media de la tarde del 24 de mayo de 1961 se personó a la oficina del Fiscal Dueño para ayudar y acompañar al Lcdo. Frank Abella que estaba detenido para investigación por el Fiscal; que allí estaban el Lcdo. Frank Abella, el Lcdo. Celestino Iriarte, hijo, y el demandante, y más tarde entró el Sr. Luis de Casenave, empleado de El Mundo. Conocía al Sr. Casenave hace muchos años, en el tiempo en que el demandante iba al hipódromo para el año 1930. El Sr. Casenave entró con una cámara por la puerta de la Calle San Francisco, llamó al Lcdo. Iriarte y se fueron a un pasillo a la salida de la sala donde hablaron y conferenciaron. Al rato el Lcdo. Iriarte llamó al demandante y le dijo en presencia de Casenave: "Mira, Jorge, Casenave quiere tomarle una fotografía a Frank. Yo le he dicho que no." "Mi opinión es la misma, que no se le tomen fotografías." Casenave entonces contestó que lo iban a retratar de todas maneras, porque había fotógrafos de El Imparcial y del San Juan Star en distintas azoteas y distintos sitios esperando que él saliera del tribunal. Que entonces el demandante se retiró y se fue a hablar con el Lcdo. Abella y cuando así hablaba pudo notar que Casenave estaba enfocándolos. Estaban ellos dos, el demandante y Abella. Entonces Abella se levantó de donde estaba sentado y se fue. El demandante estaba de pie y el Sr. Casenave tomó la fotografía y se fue. El Sr. Casenave

trabajaba con el lente de la cámara enfocando para donde estaban el demandante y Abella. Se fue inmediatamente que tomó la fotografía sin hablar con ellos. Esa tarde el demandante sirvió de fiador a su compañero Abella.

Repreguntado por la parte demandada, declaró el Lcdo. Romany que era amigo íntimo de Abella y le quiso servir de fiador, y del Lcdo. Celestino M. Iriarte. Que en una silla estaba sentado Abella y el demandante estaba parado a su lado hablando con él; que al momento de entrar el Sr. Casenave el Lcdo. Iriarte y el demandante estaban parados juntos y el Lcdo. Abella sentado; que como amigo y abogado tenía interés en que no se le tomara una fotografía a Abella; que presumía que Casenave no conocía quién era Abella, al tomarle la fotografía al demandante; [2] que usó una cámara grande de unas 10″ cuadradas y no una pequeña Polaroid; que vio al Sr. Casenave cuando lo estaba enfocando; que no le dijo que no le tomara una fotografía; que cuando Abella se levantó de la silla el demandante miró hacia el frente y vio a Casenave enfocándolo y ahí mismo tomó la fotografía; que estaba de lado y cuando vio que el Lcdo. Abella se levantó viró la cara completamente y se puso de frente como aparece en la fotografía, o sea, giró hacia el frente para ver qué estaba ocurriendo; que en el momento en que lo enfocaba Casenave estaba de frente pero retirado como de 8 a 10 pies. Que la fotografía que él objetaba era la de Frank Abella. Que el Lcdo. Abella no estaba presente cuando hablaron delante de Casenave sobre el que no se le tomara una fotografía.

Por otra parte, la versión del incidente dada por el Sr. Casenave en Corte fue la siguiente: Al preguntársele si el 24 de mayo de 1961 conocía personalmente al Lcdo. Jorge F. Romany contestó que lo conocía cuando era muchacho, que era atleta, que desde muchacho no lo había vuelto a ver y que

---

[2] El demandante se expresó así: "P. Pero el Sr. Casenave no conocía quien era Abella?" R. "Presumo que no. Al tomar la fotografía mía, necesariamente no sabía quién era Abella."

no conocía al Lcdo. Frank Abella Blanco. Al entrar a la Sala de la oficina del Fiscal Dueño la persona que conocía era al Lcdo. Celestino Iriarte quien estaba sentado junto al Lcdo. Romany que después supo que era Romany. Le preguntó (al Lcdo. Iriarte) quién era el acusado y le señaló para Romany. Preguntó si podía tomarle una fotografía y asintió con la cabeza y entonces hizo una fotografía del Lcdo. Romany sin *"flash"* en la antesala de la oficina del Fiscal Dueño. Que tomó el tiempo necesario para ajustar la cámara, enfocar y poner el obturador, llevarla a los ojos, buscar el fijador y fotografiar; que cuando estaba ajustando la cámara estaba de frente al Lcdo. Romany; que en momento alguno el Lcdo. Romany le dijo que él no era el acusado, que no le tomara fotografía; que en momento alguno salió al pasillo a hablar con el Lcdo. Iriarte sino que el Lcdo. Iriarte y el Lcdo. Romany estaban sentados; que el Lcdo. Romany estaba sentado con unas gafas negras; que había alguien más sentado al lado izquierdo pero no puede precisar quién era "porque entré directamente a la persona que conocía allí únicamente, que era el licenciado Iriarte"; que antes del Lcdo. Iriarte decirle que ése era el acusado él no vio que hablara con la otra persona que estaba a su lado; que el ambiente allí era de un silencio enorme y el testigo se acercó al Lcdo. Iriarte.

Repreguntado, dijo que estuvo segundos en la oficina, lo que le tomó para entrar, hablar con el Lcdo. Iriarte, tomar la fotografía y salir. Notó que había alguna persona sentada acá, pero no se fijó; algunas personas, menos de cinco; que cuando él habló con el Lcdo. Iriarte el Lcdo. Romany estaba al lado de Iriarte, frente al testigo; que al preguntar por el acusado el Lcdo. Iriarte señaló hacia el Lcdo. Romany; estaban ellos dos solos. Que no habló con el Lcdo. Romany, "es más, no lo conocía. De muchacho, cuando era joven, que tenía pelo y luego tenía unas gafas negras." Negó que en el pasillo hablaran el Lcdo. Iriarte, él y el Lcdo. Romany.

Aceptó que dirigiéndose al Lcdo. Iriarte, y no al Lcdo. Romany, expresó que mejor era que le tomaran retratos aquí (a Abella) porque estaba El Imparcial y estaba el San Juan Star afuera.

El Lcdo. Iriarte declaró que se encontraba allí con el Lcdo. Romany y el Lcdo. Frank Abella. Estaban sentados indistintamente en una u otra silla en la antesala de la oficina del Fiscal Dueño al llegar el Sr. Casenave. Recuerda que habló con Casenave en el pasillo de la antesala. No sabe si Casenave le preguntó quién era Frank Abella o si el testigo le indicó a Casenave quien era Frank Abella. Dijo que Casenave le indicó que deseaba tomarle una fotografía al Lcdo. Frank Abella y él le pidió que no la tomara porque era su fraterno y que como favor no le diera mucha publicidad a lo que le había ocurrido a su fraterno Frank Abella. Casenave le dijo "de todas maneras van a tomar fotografías". Entonces él llamó al Lcdo. Romany, que según su mejor recuerdo estaba en la antesala, y le dijo: "Jorge, Casenave quiere tomarle fotos a Frank", y que a eso Jorge dijo que no debería tomarse fotografías para no darle publicidad, estando presente el Sr. Casenave. Que de ahí no recuerda dónde se sentó el testigo o dónde se sentó el Lcdo. Romany y dónde se sentó el Lcdo. Abella, pero estando él en la antesala le tomaron una fotografía al Lcdo. Romany y no recuerda si posó o no posó. Que según su recuerdo no pudo haber sido que él le señalara a Casenave al Sr. Romany como el Sr. Abella porque él conocía a los dos. No podría decir si hubo la posibilidad de que él hubiera hecho una indicación descuidada o sin precisar hacia el Lcdo. Romany que pudiera haber dado lugar a una equivocación. Que le extrañó que tomaran el retrato del Lcdo. Romany e hizo un comentario con éste, pero no le dijo después del retrato al Sr. Casenave que había tomado una fotografía del Lcdo. Romany. Expresó el testigo que realmente no recordaba si en algún momento le señaló a Casenave la persona del Lcdo. Frank Abella; que tampoco recordaba si en

algún momento vio al Lcdo. Romany señalarle al Sr. Casenave la persona del Lcdo. Frank Abella.

La Sala sentenciadora no hizo expresión en cuanto a cuál de esas versiones en conflicto le mereció crédito. No obstante, hay un hecho incontrovertible, independientemente de si Casenave retrataba al demandante a sabiendas de que era él, o si lo retrató en la creencia de que era el Lcdo. Abella. El demandante no expresó oposición a que se le retratara en relación con el asunto envuelto, y en aquel sitio. Tampoco ha objetado la publicación cuando su fotografía apareció debidamente identificada con su persona, en la primera edición del número siguiente.

Con esa situación de hecho en el récord como fondo, la Sala sentenciadora concluyó en derecho que El Mundo cometió un libelo del demandante con la publicación aludida.

La Ley estableciendo "una acción civil por daños y perjuicios ocasionados por libelo y calumnia", de 19 de febrero de 1902,(³) define libelo como la difamación *maliciosa* que públicamente se hace en contra de una persona, por escrito, impreso, signo, retrato, figura, efigie u otro medio mecánico de publicación, tendente a exponer a dicha persona al odio del pueblo o a su desprecio, o a privarle del beneficio de la confianza pública y trato social, o a perjudicarle en sus negocios; o de otro modo desacreditarle, menospreciarle o deshonrarle, . . . .

Para que exista libelo a los efectos de la acción en daños que concede esta Ley es preciso que la difamación sea maliciosa. La malicia es un ingrediente indispensable. *Quiñones* v. *J. T. Silva Banking & Commercial Co.*, 16 D.P.R. 696 (1910), pág. 699; cf. *Perea* v. *Gómez Hnos.*, 21 D.P.R. 26 (1914), pág. 29; *Mulero* v. *Martínez*, 58 D.P.R. 321 (1941), pág. 324. Sin embargo, la ley presume que hay malicia en cualquier comunicación o escrito infamatorio o calumnioso dirigido a otra persona que no sea un pariente dentro del

(³) 32 L.P.R.A. secs. 3141–3149.

tercer grado, o a una persona a quien el autor tenga bajo tutela, o cuando dicha comunicación se cruce entre personas que tengan negocios en sociedad, u otra asociación semejante. —Sec. 5, Ley de 1902.—La doctrina ha establecido que en libelo la imputación pública hecha a una persona de que ha cometido delito penable es infamatoria por su propia naturaleza. En tal caso, y a menos que caiga dentro de la excepción mencionada en la Sec. 5, la ley presume que la publicación se hizo con malicia, o sea, que hay libelo.

■ Pero la Ley de 1902 también establece—Sec. 4—que no se presumirá maliciosa la publicación hecha en un informe *justo y verdadero* de un procedimiento judicial, legislativo u otro procedimiento cualquiera, o de algo dicho en el curso de dichos procedimientos. En tal caso la ley no presume malicia en la publicación, y la malicia deberá ser probada con evidencia independiente de la publicación misma, si se desea obtener daños bajo dicho estatuto y éstos también han de ser probados específicamente. [4]

El caso ante nos presenta características muy propias, que no comparan del todo con las situaciones ordinarias de la publicación de fotografías como libelo. [5] Es preciso que se analice y se decida a la luz de sus características en particular.

Tomándose la publicación de la fotografía del demandante identificada como la de Frank Abella Blanco con independencia absoluta de la información que la acompaña, la

---

[4] Cf. *Las Monjas Racing Corp.* v. *Puerto Rico Ilustrado*, 58 D.P.R. 931 (1941), págs. 937–38; *Moraza* v. *Rexach Sporting Corp.*, 68 D.P.R. 468 (1948), pág. 471; *Jiménez* v. *Díaz Caneja*, 14 D.P.R. 9 (1908), págs. 13–14, 18, 20; *Rivera* v. *Martínez*, 26 D.P.R. 760 (1918), pág. 764; *Caraballo* v. *P.R. Ilustrado, Inc.*, 70 D.P.R. 283 (1949), pág. 291; *Casanova* v. *González Padín*, 47 D.P.R. 488 (1934), pág. 496; *Franco* v. *Martínez*, 29 D.P.R. 237 (1921), pág. 240; *Quiñones* v. *J. T. Silva Banking, etc.*, ante, pág. 698.

[5] Véase la exposición en Thayer, *Legal Control of the Press* (1956), "Pictured Libel", págs. 258 y sgtes.; Arthur, *The Law of Newspapers*, (1940), "Photographs", págs. 163 y sgtes., 172; Swindler, *Problems of Law in Journalism* (1955), pág. 140; cf. *Peck* v. *Tribune Co.*, 214 U.S. 185.

fotografía indebidamente identificada no sería libelosa por sí misma. De ordinario, el demandante no se hubiera sentido difamado porque se identificara una fotografía suya con la persona de su íntimo amigo y compañero profesional.

Tomándose la publicación de la información con independencia absoluta de la fotografía que la acompaña,—en donde en momento alguno se menciona al demandante, y en sus detalles no da lugar a que los hechos pudieran relacionarse con los actos y la vida de éste,—la información por sí misma tampoco constituía libelo por ausencia del elemento de malicia. —Sec. 4.—El propio demandante alegó que la publicación era cierta en cuanto a los hechos de la persona a que se refería expuestos en la noticia. Nada hay en el récord que demuestre que la misma no constituyó un relato justo y verdadero de esos hechos, o que la información se publicó con fines maliciosos.

Es preciso, por consiguiente, tomar la fotografía así identificada y la información en conjunto, como un solo cuerpo. En las circunstancias anotadas, en que, por separado, ni la fotografía, ni la información eran libelo, el demandante venía obligado a probar, con evidencia independiente de la publicación misma, que la identificación indebida de su fotografía con el nombre de la persona a quien se refería la información fue un acto *malicioso* de la demandada, para que la publicación en conjunto constituyera un libelo contra él a los efectos de la causa de acción de daños que concede la Ley de 1902. Las circunstancias presentes y los hechos como ocurrieron al tomarse la fotografía en la fiscalía de San Juan según surgen del récord, no sostendrían una conclusión de que El Mundo actuara con malicia en la equivocada identificación. Ante los hechos particulares de este caso, nos parece que fue improcedente fallarlo aplicando las disposiciones del estatuto de libelo de 1902.

Sin embargo, la revisión se da contra la sentencia y no contra sus fundamentos. El que no quedara probado un

libelo, por ausencia del ingrediente de malicia, no quiere decir que el demandante no sea acreedor en ley a un resarcimiento en otro concepto. Dispone el Art. 1802 del Código Civil—Ed. 1930—que el que por acción u omisión causa daño a otro, interviniendo *culpa o negligencia,* está obligado a reparar el daño causado. Y el 1803 hace responsable en ese sentido a los empresarios respecto a los actos de sus empleados en el curso de sus funciones como tales.

Si la publicación de la fotografía del demandante identificada como la de la persona del Lcdo. Abella Blanco en ocasión de esos acontecimientos infortunados le causó a él daños, constituye una obligación legal de la demandada reparar el daño causado si se demostrare, aun cuando no hubiera malicia, que actuó negligentemente.[6] Según el Art. 1042, las obligaciones nacen de la ley, de los contratos o cuasi-contratos, y de los *actos u omisiones* ilícitos o en que intervenga *cualquier género de culpa o negligencia,* y toda obligación—Art. 1041—consiste en dar, hacer *o no hacer* alguna cosa. El estatuto especial de libelo de 1902 no impide en este caso tal resarcimiento bajo el 1802, aun cuando no fueren aplicables entonces las presunciones que establece dicho estatuto especial y que alteran las normas de evidencia de ordinario aplicables en cuanto a la necesidad de probar un hecho o a quién corresponde el peso de la prueba.

■ A tenor de los hechos en el récord, entendemos que la empresa demandada incurrió en algún género de culpa o negligencia bajo los preceptos de ley citados. Si el Sr. Casenave retrató al demandante en la creencia honesta, aunque equivocada, de que él era la persona de Frank Abella Blanco y así llevó la información al periódico, en las circunstancias de personas, de tiempo y de lugar que demuestra el récord—Art. 1057—incurrió en negligencia al no comprobar y cerciorarse

---

[6] Harper & James, *Law of Torts* (1956), pág. 369. *First National City Bank* v. *González Martínez,* (U.S.D.C.-P.R.), 293 F.2d 919. Cf. *Rivera* v. *Martínez,* ante, pág. 764.

debidamente en cuanto a la identidad de la persona retratada, sobre todo considerando su propia declaración de que en ese momento no conocía personalmente ni al Lcdo. Romany ni al Lcdo. Abella Blanco. Por el contrario, si el Sr. Casenave retrató al demandante sabiendo que era él e identificó la fotografía y luego al prepararse la información el retrato se publicó indebidamente identificado, ello también debió constituir negligencia de algún otro empleado o dependiente de la empresa demandada. Solamente no se responde de aquellos sucesos que no hubieren podido preverse o que previstos, fueren inevitables, reza el Art. 1058. En las circunstancias expresadas, la demandada debe responder al demandante de aquellos daños que él sufriera y hubiere probado, como consecuencia de la publicación. Veamos de nuevo el récord en cuanto a los daños probados.

Al comenzarse la vista del caso el demandante renunció expresamente a reclamar por concepto de pérdida de ingresos con motivo de los hechos expuestos en la demanda. Tampoco hay prueba de ningún otro daño de carácter especial. Declaró el demandante que al llegar a su oficina esa mañana empezó a recibir llamadas telefónicas en relación con la fotografía, de amigos y de clientes. Llamó entonces al Lcdo. Rivera Cestero, abogado de El Mundo y le informó al Lcdo. Rúa de lo ocurrido para que hiciera el favor de llamar a la redacción y rectificaran la publicación. Cree que ese día recibió alrededor de 25 llamadas, entre ellas una del Sr. Emilio Huyke de la redacción de El Mundo para decirle que sentía mucho lo que había ocurrido y que si él hubiera estado esa noche allí cuando se confeccionó la noticia, no hubiera ocurrido porque él (el Sr. Huyke) conocía al demandante. Que cuando salió a la calle ese día creía que las personas lo miraban con motivo de la publicación y optó por quedarse a almorzar en la oficina. Desistió de ir a una vista que tenía esa tarde en la Corte de Quiebras y pidió su suspensión prefiriendo irse para su casa, y se sentía molesto. Esa noche estando en la Bolera con su

señora recibió varias bromas de los amigos y compañeros de juego, y optó por irse del sitio. Al día siguiente, mientras venía a su oficina por la carretera de Bayamón hacia San Juan tuvo que quitarse las gafas durante un "tapón" porque estaba consciente de que como el retrato tenía gafas las personas a su alrededor lo miraban por la cuestión del retrato. Optó por guiar sin gafas ese día y el día siguiente. A principios de junio o julio, alrededor de un mes después de la publicación, se le acercó el Sr. Octavio Costas para decirle que lo había confundido y que él creía que era el Lcdo. Abella. Que el Sr. Costas le había hecho esas manifestaciones al Lcdo. Castro Fernández y éste lo había sacado de dudas. El demandante no conocía al Sr. Costas. Expresó que toda esa situación dio lugar a una serie de bromas de mal gusto que le causó gran pena y molestias. Se sentía incómodo. Algunas bromas venían de personas conocidas y no le estaban tan malas, otras de personas que no le caían bien y le causaban molestias, y se fue de la Bolera por no tener un disgusto personal. Lo mismo le sucedió a las dos noches en Caparra Country Club en donde hubo las mismas bromas. En la repregunta manifestó que durante una campaña en que él fue candidato para un cargo público y hubo alguna publicidad, nunca se publicó su retrato, y su único retrato en El Mundo fue al tomar la reválida. Que esa mañana recibió una llamada de Radio San Juan pidiéndole una entrevista; que las 25 llamadas podían haber sido más o menos, fueron más de cinco porque al llegar por la mañana su secretaria le dijo que habían llamado un montón de personas y otras hablaron con ella y ella les había dado una explicación y ahí acabó el asunto.

El testigo del demandante Sr. Vicente Balbás Ortiz declaró haber visto al Lcdo. Romany en la Bolera Star con quien se reunía a menudo; que con motivo de la publicación al entrar el Lcdo. Romany en la bolera un grupo de personas compañeros de dicho juego que participaban en la misma liga lo embromaron; que en ese momento de las bromas el de-

mandante estaba serio, se notaba un poco molesto y les pidió que dejaran las bromas; que siguieron las mismas y él optó por dejar el sitio y se fue del grupo.

Octavio Costas declaró que veía de cara al demandante frecuentemente en el negocio de Manolín donde almorzaba; que al ver al demandante frente a la caja registradora comentó: "este hombre tan tranquilo que se ve ahí y tan pacífico y le cayó a tiros a uno y mató a uno," porque en El Mundo había visto el retrato de él; que al pagar la cuenta comentó frente a Manolín "Adios, si éste había matado a uno" y el otro licenciado dijo "Éste es el Licenciado Romany", y él comentó "Yo creía que éste había matado a uno porque lo leí." Afuera el demandante le dijo "Yo no he matado a nadie, porque yo soy el licenciado Romany". El testigo le contestó "Yo creía que usted había matado a alguien porque lo 'veí' en el periódico." En la repregunta dijo que a veces leía los periódicos de 15 días en 2 ó 3 noches porque estaba muy ocupado, y que al ver el retrato pensó que no se iba a sentar más al lado del demandante mientras almorzaban en el negocio de Manolín. Aparte del natural desagrado, la declaración de este testigo no demuestra daños especiales.

Estatuye el Art. 1056 del Código Civil que la responsabilidad que proceda de *negligencia* es igualmente exigible en el cumplimiento de toda clase de obligaciones, pero *podrá moderarse* por los tribunales según los casos. (7)

■ Hay en el récord de este caso circunstancias y elementos de juicio que permiten moderar la responsabilidad. Los que

---

(7) Lo dispuesto en el Art. 1056 es de carácter general, aplicable a todo género de obligaciones sin que ofrezca contradicción con las obligaciones que surgen de los Arts. 1802 y 1803. Así se dijo en sentencia del Tribunal Supremo de España de 14 de diciembre de 1894, Jur. Civil, Tomo 76, pág. 483. Cf. Manresa, *Código Civil*, Tomo 8, Vol. 1, 5ta. ed. (1950), pág. 196.

Bajo una acción de libelo propiamente, el Art. 131 del Código de Enjuiciamiento Civil, que está en vigor, permite en la contestación cualquier circunstancia atenuante para reducir la cuantía de los perjuicios, se probare o no la verdad del hecho, y la presentación de prueba de circunstancias atenuantes.

sólo leen la primera edición del periódico El Mundo nunca llegaron a enterarse. Hacemos la observación porque el demandante, en su recurso, sosteniendo su derecho a mayores daños, señala la gran circulación del periódico. Todos aquellos lectores de la segunda edición que conocían personalmente al Lcdo. Romany o personalmente al Lcdo. Abella Blanco, tenían que comprender que había error en la identificación del retrato, pero no entenderían que al demandante se le imputaban los hechos delicitivos. En relación con personas como el testigo Costas, el récord demuestra que El Mundo publicó de inmediato una nota de corrección debidamente destacada en adición a reproducir la fotografía de manera correcta. Ya expresamos que el demandante no alegó pérdida de ingresos ni ningún otro daño especial.

Es incuestionable que la negligencia de la demandada causó alguna preocupación mental y desasosiego al demandante. Considerando todas las circunstancias del caso, entendemos que la responsabilidad pecuniaria según la determinó la Sala sentenciadora debe ser moderada.

*Lo anteriormente expresado dispone de ambos recursos. Se modificará la sentencia para que disponga que la demandada, empresa El Mundo, Inc., deberá satisfacer al demandante por concepto de daños la cantidad de $1,500 y $500 de honorarios de abogado ante el Tribunal de instancia, y así modificada, se confirmará.*