Félix Caraballo, demandante y apelante, *v.* Puerto Rico Ilustrado, Inc., José Coll Vidal y Ángel Ramos, demandados y apelados.

Núm. 9872.—*Sometido:* Abril 21, 1949. *Resuelto:* Julio 13, 1949.

284

*José M. Valentín Esteves y Jorge Díaz Cruz*, abogados del apelante; *R. Rivera Zayas, G. Rivera Cestero y Milton F. Rúa*, abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del tribunal.

En la edición del 26 de mayo de 1943 del periódico "El Mundo", que se edita en esta capital, apareció la siguiente información:

"Acusados de Dividir un Billete en Dos.

"Ante la Corte Municipal de Yauco han sido denunciados por la Policía, por supuestos delitos de falsa representación e impostura, Osvaldo Pérez del Rosario, blanco, de 17 años de edad, y Félix Caraballo, blanco, de 45 años. Al primero se le acusa de que trató de cambiar un billete de un dólar dividido en dos en la sucursal del Banco Crédito y Ahorro Ponceño de aquella población y al segundo de haberle entregado a Pérez del Rosario el citado billete para que tratara de cambiarlo en dicha casa bancaria.

"Como se recordará, en San Juan, hace algunas semanas, un individuo pagó al cobrador de una guagua 'su pasaje' hasta Río Piedras con un billete al cual le había despegado el reverso, y luego en Villapalmeras pagó a un chófer con el anverso. Se desconoce si los individuos arrestados tienen conexión con los casos informados en San Juan."

Fundado en que la publicación del anterior artículo se refería a él y en que el mismo le había producido extrema humillación, vergüenza y denigración, Félix Caraballo radicó ante la Corte de Distrito de Ponce demanda contra Puerto Rico Ilustrado, Inc., José Coll Vidal y Ángel Ramos, reclamando una indemnización de $10,000 por concepto de los daños y perjuicios sufridos. A ella contestaron los demandados alegando que la demanda no aducía hechos constitutivos de causa de acción; admitiendo el hecho de la publicación pero negando que ésta se hiciera maliciosamente y alegando que, por el contrario, se hizo por motivos justificados, sin intención aviesa de clase alguna y que ella constituye un informe justo y verdadero de un procedimiento seguido por la policía en su cuartel de la ciudad de Yauco el 13 de mayo de 1943, reportado al Cuartel General de la Policía Insular el 23 de mayo del mismo año y publicado por "El Mundo" en cumplimiento del deber que tiene dicho periódico de informar a la comunidad los actos oficiales ocurridos en la investigación de hechos delictivos o supuestamente delictivos con la intención de servir al procomún.

Visto el caso en sus méritos ante el Tribunal de Distrito de San Juan, donde fué trasladado a petición de los deman-

dados, éste dictó sentencia declarando sin lugar la demanda, con costas.

Un solo error señala el demandante en apelación. Éste es al efecto de que "la corte inferior cometió error al desestimar la demanda de este caso por los fundamentos de que la publicación que sirvió de base a este pleito es condicionalmente privilegiada y fué hecha sin malicia, siendo dicha sentencia contraria a derecho, a los hechos y a la prueba practicada en este caso." Al discutir este error sostiene en primer término que el contenido de la publicación no es una copia fiel de la fuente de información que alegan los demandados les sirvió de base sino que fué por ellos adulterada; y que el periódico, además, añadió un párrafo por su cuenta insinuando que el demandante estaba conectado con otros delitos de igual naturaleza realizados en San Juan.

La ley que rige la materia en esta isla lo es la aprobada el 19 de febrero de 1902, que aparece publicada a la página 308 del Código de Enjuiciamiento Civil, edición de 1933. Por el artículo 1 de ella se establece en la Isla de Puerto Rico una acción civil por daños y perjuicios ocasionados por libelo y calumnia. Por el artículo 2 que "Se entiende por libelo la difamación maliciosa que públicamente se hace en contra de una persona, por escrito, impreso, signo, retrato, figura, efigie u otro medio mecánico de publicación, tendente a exponer a dicha persona al odio del pueblo o a su desprecio, o a privarle del beneficio de la confianza pública y trato social, o a perjudicarle en sus negocios; o de otro modo desacreditarle, menospreciarle o deshonrarle, o cualquiera difamación maliciosa publicada, como antes se ha dicho, con la intención de denigrar o deprimir la memoria de un muerto y desacreditar o provocar los parientes y amigos sobrevivientes," y por el artículo 4 que "No se tendrá por maliciosa, ni como tal se considerará la publicación que se hace en un procedimiento legislativo, judicial, u otro procedimiento cualquiera autorizado por la ley. No se presumirá que es mali-

ciosa la publicación que se hace: Primero: En el propio desempeño de un cargo oficial; Segundo: En un informe justo y verdadero, de un procedimiento judicial, legislativo u oficial, u otro procedimiento cualquiera, o de algo dicho en el curso de dichos procedimientos; Tercero: A un funcionario oficial, apoyada en causa probable, con la intención de servir al procomún, o de conseguir remedio a un perjuicio hecho a un particular.''

El carácter libeloso del artículo publicado se da por admitido y la cuestión a ser determinada es si la publicación se hizo maliciosamente y si en su virtud responden los demandados de daños y perjuicios al demandante; o si por el contrario al hacer tal publicación no hubo malicia de parte de los demandados, si al hacerla están ellos amparados por algún privilegio, absoluto o condicional, y si no responden, por ende, de daños de clase alguna.

La prueba aducida en el caso tendió a demostrar que allá para el día 13 de mayo de 1943 Osvaldo Pérez del Rosario se presentó en la sucursal que el Banco Crédito y Ahorro Ponceño tiene en el pueblo de Yauco y solicitó le cambiaran un billete de $1; que al notar uno de los empleados que el mismo estaba mutilado por haberse dividido en dos, se llamó a un policía y éste condujo a Osvaldo al cuartel de la policía de dicho pueblo, donde informó que el mismo le había sido entregado por Félix Caraballo; que Caraballo se trasladó al cuartel a iniciativa propia al tener conocimiento de lo ocurrido; que el billete fué como cuestión de hecho entregado en unión a otros por Caraballo a Osvaldo Pérez en pago de una cuenta existente en favor de un tercero; que la publicación de dicho artículo arruinó al demandante en sus negocios y hasta le hizo pensar en cometer suicidio; que en relación con el asunto el Jefe de la Policía de Yauco informó por escrito al Cuartel General de la Policía en San Juan lo siguiente:

''Policía Insular de Puerto Rico—Dtto. de Yauco, P. R., 23 de mayo del 1943.—Núm. 1,839.—Asunto: Billete Mutilado, Serie 1935A,

288

Núm. M40482303B, Ocupado.—A: Jefe de la Policía Insular—San Juan.—1—Tengo a bien comunicarle que en mayo 13 del 1943, a las 10:00 A.M. en el Banco Crédito y Ahorro Ponceño, de esta localidad, el individuo Osvaldo Pérez del Rosario, blanco, de 17 años de edad, natural de Yauco, y residente en el mismo, calle Tendal, trató de cambiar un billete de un dólar, CERTIFICADO PLATA, Núm. M40482303B, Serie del 1935A, moneda corriente americana, dividido en dos, deteriorado al tratar de hacerlo en dos.—2.—El Gerente del Banco, Sr. Jacinto Ortiz, dió conocimiento a esta oficina y el Gdia. Santiago Silva núm. 1241 hizo la investigación resultando que Félix Caraballo, blanco, de 45 años de edad, natural y vecino de la calle Buena Vista de esta municipalidad, le dió dicho billete falso y mutilado al joven Osvaldo Pérez del Rosario para que lo tratara de cambiar en el banco. El billete fué ocupado y el caso ha sido denunciado ante la Corte Municipal contra ambos por un delito de Falsa Representación e Impostura. (fdo.) José Martínez, Jefe de Dtto., P.I., 5ta Clase.—Headquarters Insular Police—Received May 25, 1943.—''

Que Félix Caraballo nunca fué arrestado ni denunciado ante la Corte Municipal de Yauco con motivo de dicho billete y jamás lo ha sido por ningún otro delito; que el artículo publicado fué tomado por Rafael Gil de Lamadrid, empleado de los demandados, del Libro de Novedades existente en el Cuartel General de la Policía en San Juan; que el mismo no es una copia *verbatim* del asiento que sobre el particular aparece en el indicado libro; y que ni los demandados ni su empleado Gil de Lamadrid conocían a Caraballo.

█ Como hemos visto, el artículo 4 de la Ley que autoriza pleitos civiles de daños y perjuicios por libelo, expresamente dispone que no se tendrá por maliciosa, ni como tal se considerará, la publicación que se hace en un procedimiento legislativo, judicial, u otro procedimiento cualquiera autorizado por la ley. La publicación de tales procedimientos es condicionalmente privilegiada. El privilegio surge, según expresa el Juez Holmes en *Cowley* v. *Pulsifer*, 137 Mass. 392, 50 Am. Rep. 318, del hecho de que ''es preferible que las causas se ventilen ante los ojos públicos, no porque las con-

troversias que existan entre un ciudadano y otro sean de interés público, sino porque es de suma importancia que aquellos que administran justicia estén siempre conscientes de su responsabilidad hacia el público, y que todo ciudadano se convenza por sus propios ojos de la forma en que se da cumplimiento a un deber público.''

█ Sería empresa fútil tratar de demostrar que un asiento hecho en el Libro de Novedades de la Policía constituye un procedimiento legislativo. Tampoco constituye tal asiento un procedimiento judicial. 132 A.L.R. 495; *Lancour v. Herald & Globe Ass'n.*, 17 A.2d 253, 259. Ni un procedimiento cualquiera autorizado por ley. Ese libro se lleva en todos los distritos policíacos de Puerto Rico de conformidad con el artículo XLV del Reglamento de la Policía Insular, aprobado el 13 de agosto de 1928, una lectura del cual nos convence inmediatamente de que el mismo no constituye un procedimiento de clase alguna.[1]

---

[1]El artículo XLV del Reglamento de la Policía Insular, aprobado en agosto 13 de 1928, según quedó enmendado en 2 de enero de 1942, reza textualmente así:

''Regla 1.—En todos los distritos de la Policía Insular se llevarán los siguientes registros:

''(A) LIBRO AUXILIAR.

''En este libro se anotarán las novedades inmediatamente después de ocurridas, precisándose la fecha y la hora exacta, con todos los detalles del caso. Además se anotarán las entradas y salidas de los guardias del distrito y los demás miembros de la fuerza que se reporten al mismo por licencia u otras causas; se anotarán las salidas a los campos a pie, a caballo, en bicicleta o automóvil, y a su regreso, las novedades del servicio con los kilómetros recorridos; así como toda información o suceso en relación con las actividades de la policía. El individuo de la fuerza que haga cualquier informe en este libro, sea de la clase que fuere, deberá hacer constar, encabezando el mismo y con tinta roja, la fecha y hora exacta en que se procede a hacer dicho informe. Luego en la siguiente línea y con tinta negra o azul comenzará dicho informe, y al terminar, inmediatamente después del punto con que se termine la última oración, estampará su firma con su categoría o rango dentro del Cuerpo. El guardia de retén será responsable de la limpieza y conservación de este libro. En este libro queda terminantemente prohibido escribir entre líneas, y entre informe e informe se dejarán dos líneas en blanco. El guardia de retén anotará en este libro la hora en que suba y baje la bandera. El oficial encargado de la instrucción deberá anotar en este libro, los nombres de los que concurran a la academia diaria y materia explicada.''

Aunque se ha dicho que las manifestaciones hechas por funcionarios de la policía no deben considerarse en manera alguna como privilegiadas, sin embargo, la publicación de un informe correcto de los asientos que figuran en los libros del Departamento de Policía tiene derecho a gozar de un privilegio condicional. El Libro de Novedades de la Policía no goza de un *status* legal claro y definido y el mismo, en opinión de los versados en la materia como récord público constituye un enigma. Existen Estados de la Unión en que por estatuto el Libro de Novedades es considerado como un récord público. Hay otros en que se le considera como tal a virtud de opiniones extraoficiales emitidas por los respec-tivos Procuradores Generales y aun otros en que disfrutan de tal naturaleza a virtud de ordenanzas municipales. También hay estados en que el Libro de Novedades no es considerado como récord público a virtud de estatuto, de opiniones extraoficiales de los Procuradores Generales o de opiniones judiciales. Igualmente hay muchos otros en que la cuestión no ha sido jamás suscitada ni resuelta. Véanse "*Legal Control of the Press*" por Frank Thayer, ed. de 1944, págs. 138 y 139; y "*The Law of Newspapers*" por Arthur and Crosman, ed. 1940, pág. 204.[2]

El privilegio de que disfruta un periódico al publicar el contenido de los asientos en el Libro de Novedades está sujeto a la condición de que lo publicado sea una relación razonable y verídica de lo contenido en el Libro de Novedades de la Policía. De ahí que se diga que el privilegio es condicional. *Legal Control of the Press*, supra; *Law of the Press*, por Hale & Benson, ed. 1933, pág. 151; *Law of Newspapers*, por Arthur and Crosman, supra, págs. 290–291; *Essentials of Libel*, por Paul P. Ashley, ed. de 1948, pág. 41;

[2] En ninguno de los casos en que este Tribunal ha hecho mención del Libro de Novedades se ha resuelto específicamente si el mismo constituye o no un récord público. Véanse: *Rosario v. Lalaite*, 55 D.P.R. 198; *Nieves v. White Star Bus Line, Inc.*, 49 D.P.R. 73; *Medina v. White Star Bus Line*, 47 D.P.R. 565 y *Pueblo v. Viana*, 41 D.P.R. 413.

Ann. Cas., 1917B, pág. 424; 33 Am. Jur., págs. 154, 155, 161, secs. 159, 162 y 167; *McClure* v. *Review Pub. Co.*, 80 Pac. 303; *Morasca* v. *Item Co.*, 126 La. 426, 52 So. 565; 2 *Readings In Torts,* por Fowler V. Harper, pág. 1116. Cf. *Burrows* v. *Pulitzer Pub. Co.*, 255 S.W. 925, 929.

 Si se compara en el presente caso la información publicada en el periódico "El Mundo" con la información escrita trasmitida por el Jefe de la Policía de Yauco al Cuartel General de la Policía en San Juan, se convence uno inmediatamente de que la primera es una relación bastante fiel y exacta de la segunda. No demostró la prueba, sin embargo, que la denuncia fuera como cuestión de hecho radicada ante la corte municipal, pero lo publicado por el periódico no alteró la versión del Libro de Novedades, ya que éste así lo hacía constar.

El privilegio condicional comprende la publicación de toda comunicación hecha de buena fe en relación con un asunto en que el autor tiene interés o con respecto al cual tiene un deber que cumplir hacia otros. Se le considera condicional porque la persona que lo utiliza deberá hacerlo de acuerdo con la ley y para un fin apropiado. El privilegio justifica la comunicación siempre que se haga sin malicia expresa. *Pryzant* v. *Gulf Refining Company,* 83 S.W.2d 752, 753; *Purdue* v. *Montgomery Ward & Co.*, 107 S.W.2d 12, 14, 341 Mo. 252; *Kilgore* v. *Koen*, 288 Pac. 182, 194, 133 Or. 1. Aquí no existe tal malicia.

El periódico "El Mundo" se limitó, conforme ya hemos indicado, a publicar en sus propias palabras lo que su empleado Gil de Lamadrid había copiado del Libro de Novedades del Cuartel General de la Policía. No asumió la culpabilidad del demandante. Si bien es cierto que al final del mismo adicionó un párrafo recordando que "hace algunas semanas en San Juan un individuo pagó al cobrador de una guagua su pasaje hasta Río Piedras con un billete al cual le había despegado el reverso y luego en Villa Palmeras pagó

a un chófer con el anverso'' y que igualmente indicó que se desconocía si los individuos arrestados ''tienen conexión con los casos informados en San Juan,'' ningún comentario adicional agregó respecto a Caraballo. El periódico, como informador público, tenía derecho a hacer comentarios razonables, verídicos y exactos respecto a la noticia que daba. 39 Am. Jur. 20, sec. 31; 33 Am. Jur., supra. Los comentarios del periódico no fueron ni irrazonables ni inciertos, excepción hecha de que se refirió a los arrestados y la realidad demostró que el aquí demandante no lo había sido. Si según decía el Libro de Novedades, Caraballo había sido denunciado, el periódico tenía derecho a inferior lógicamente que éste había sido arrestado. *Cf*. Artículo 44 del Código de Enjuiciamiento Criminal.

*Debe confirmarse la sentencia apelada.*