FÉLIX CHICO RAMOS ET AL., demandante y recurrido, *v.* EDITORIAL PONCE, INC., PERIÓDICO EL DÍA y LUIS A. FERRÉ, demandados y recurrentes; THE ASSOCIATED PRESS (PRENSA ASOCIADA), tercera demandada y recurrida.

*Número*: R-71-166 *Resuelto*: 29 de octubre de 1973

*Rieckehoff, Calderón, Vargas & Arroyo* y *Parra, Del Valle & Frau,* abogados de los recurrentes; *Faustino R. Aponte* y *Guillermo Bird Martínez,* abogados de los recurridos; *Fiddler, González & Rodríguez, Julio M. Rodríguez* y *Salvador Antonetti Zequeira,* abogados de la tercera demandada-recurrida.

El Juez Asociado Señor Martínez Muñoz emitió la opinión del Tribunal.

Se trata de una acción de daños y perjuicios por culpa y negligencia basada en la publicación libelosa de un suelto que apareció en las páginas interiores del periódico "El Día", propiedad de Editorial Ponce, Inc., en la edición del 6 de junio de 1967. Lee así: ·

"MUERE DAMA

LUQUILLO, (AP)—La Policía de Luquillo informa que Félix Chico Ramos, de 47 años, ha sido acusado por la presunta muerte de su hermana Carmen Chico Ramos, de 43 años.

Alega la Policía que Félix, con un pedazo de madera, golpeó a su hermana Carmen, en medio de una discusión que sostuvieron en el barrio Mata de Plátano en Luquillo. La mujer murió en el Hospital de Distrito de Fajardo a donde había sido llevada."

Al contestar la demanda, la dueña del periódico alegó como defensa que, de haber alguna negligencia, dicha negligencia era de Prensa Asociada que fue la suplidora de la información supuesta libelosa. Simultáneamente el periódico trajo al pleito a Prensa Asociada mediante demanda de tercero contra Prensa Asociada, alegando que ésta tenía un contrato con el periódico El Día mediante el cual supliría información que éste a su vez daría al público en su periódico. Alegó, además, El Día que, de establecer la parte demandante en su día las alegaciones contenidas en la demanda original y obtener indemnización contra los demandados y terceros demandantes, el tribunal deberá dictar una sentencia igual contra la tercera demandada, Prensa Asociada, resarciendo al periódico por los daños que tenga éste que satisfacer a los demandantes originales, ya que la publicación que se alega que es falsa fue dada mediante culpa y negligencia de Prensa Asociada al periódico El Día cuando le remitió el parte de prensa que fue publicado casi literalmente como fue enviado por la tercera demandada.

Prensa Asociada compareció en autos, contestó la demanda original y la demanda de tercero, negando algunos hechos y admitiendo otros. Admitió que suplió la información en la que se basa la demanda de libelo y negligencia y levantó, entre otras, la defensa de que, mediante el contrato de servicios noticiosos suscrito por las partes,[1] Prensa Asociada fue relevada por El Día de toda responsabilidad por razón de reclamaciones de la naturaleza de la aquí instada; que actuó sin malicia; que la Ley de Libelo y Calumnia de Puerto Rico es inconstitucional; y que el demandante no actuó con la

---

. [1] En su texto original en inglés, la cláusula del contrato invocada por Prensa Asociada lee así:

"8.—Associated will use its best efforts to provide an accurate news service but shall not be under any liability, direct or indirect, for any loss or damage occasioned to the Subscriber or any other person, firm or corporation by reason of the publication of any of the news contained in the service."

debida diligencia para minimizar los daños que alega sufrió.

Visto el caso, el Tribunal Superior, Sala de Humacao, declaró con lugar la demanda, condenó a la dueña del periódico a abonar a los demandantes la suma de $5,000 por concepto del libelo, más $500 de honorarios de abogado; desestimó la acción de tercero instada contra Prensa Asociada, en base a la cláusula de exoneración contenida en el contrato. y a que la Regla 12.1 de las de Procedimiento Civil impedía que Prensa Asociada fuera traída al pleito bajo la práctica de tercero, condenando al periódico, además, a abonar a Prensa Asociada $200 por concepto de honorarios de abogado, más las costas del proceso.

La propietaria del periódico recurre ante nos. Como primer error alega la recurrente que el juez recurrido incidió al declarar con lugar la demanda sin prueba alguna que indicara que el periódico incurriera en malicia al hacer la publicación. Como no se elevó la transcripción de evidencia, cualquier referencia nuestra a los hechos descansa en las determinaciones del juez recurrido en torno a las cuales la parte recurrente reconoce en su memorando que no existe controversia.

En sus determinaciones el juez a quo concluyó que la Policía rindió el siguiente informe que describe fielmente lo que ocurrió:

"Para informar que hoy 6-4-67, hora 3:00 P.M. en el Bo. Mata de Plátano, sitio Vello. [sic] sitio de Luquillo, P.R. y en finca propiedad de la Sra. MARIA RAMOS LOPEZ, mientras la occisa ayudaba a su hermano FELIX CHICO RAMOS, a limpiar el solar donde él va a construir su residencia y específicamente a tumbar una palma de yagua, no se percataron ninguno de los (2) dos que la mencionada palma le iba a caer encima a la occisa, lo que sucedió siendo alcansada [sic] la SRA. CHICO RAMOS por la palma en el centro del cráneo. Fue conducida inmediatamente al Hospital Dtto. de Fajardo donde fue atendida por el Dr. Luis M. López, quien certificó su muerte pocos minutos después. Hon. Juez de Paz local, Sr. Augusto Sánchez Suárez, ordenó su autopcia [sic] del cadáver.

Las partes fueron citadas para el miércoles 6 de junio de 1967, hora 9:00 P.M. se [*sic*] llevadas a presencia del Hon. Juez de Paz local.

Se cursó mensaje Núm. 605 al aux. del Supte. en Vigilancia, además se le dio conocimiento al Hon. Fiscal de turno."

Concluyó, además, el tribunal que el suelto publicado en el periódico, el cual se transcribe al principio, sigue casi literalmente la noticia suplida vía teletipo por Prensa Asociada; (²) que lo que ocurrió fue que Félix Chico estaba nivelando un terraplén para edificar su casa cuando el viento volteó de posición una palma y ésta alcanzó a su hermana causándole la muerte; y que no hay evidencia de la fuente de la cual Prensa Asociada obtuvo la información errónea.

La recurrente cita el Art. 559 del Código Penal, 33 L.P.R.A. sec. 11(4), (³) a Manresa, *Comentarios al Código Civil Español*, (⁴) y a Black's Law Dictionary, pág. 1109, en apoyo de su tesis de que al descansar en la confiabilidad de una noticia que le fuera suplida por una agencia noticiosa, el periódico no actuó intencionalmente, sin justa causa o excusa y que, por lo tanto, no actuó con malicia al publicar el referido suelto.

■ Este enfoque es erróneo. La malicia en este caso tiene que ser definida e interpretada a la luz de la Ley de Libelo y Calumnia de 1902, 32 L.P.R.A. secs. 3141–3149, nuestra jurisprudencia y la jurisprudencia aplicable del derecho común, pues, como es sabido, nuestra Ley de Libelo y Calumnia proviene del derecho común. *Díaz* v. *P.R. Ry., Lt. & P.*

(²) La noticia publicada en El Día omite el siguiente párrafo del suelto enviado al periódico por Prensa Asociada:

"Contra Chico Ramos se formuló acusación por asesinato en primer grado y se ordenó su ingreso en la Cárcel de Distrito de Humacao, con 10 mil Dólares de Fianza. JLM 8443AAS."

(³) Este artículo define el término "malicia" como la "comisión de un acto dañoso, intencionalmente, sin justa causa o excusa, la esciente infracción de la ley en perjuicio de otra."

(⁴) Tomo 5, pág. 589 (ed. 1951).

*Co.,* 63 D.P.R. 808, 811 (1944); *Rivera* v. *Martínez,* 26 D.P.R. 760, 764 (1918).

Las Secs. 3141 a 3149 del Título 32 de L.P.R.A. establecen una acción civil por daños y perjuicios ocasionados por libelo y calumnia. La Sec. 3142 nos da la definición de libelo:

"Se entiende por libelo la difamación maliciosa que pública-mente se hace contra una persona, por escrito, impreso, signo, retrato, figura, efigie u otro medio mecánico de publicación, tendente a exponer a dicha persona al odio del pueblo o a su desprecio, o a privarle del beneficio de la confianza pública y trato social, o a perjudicarle en sus negocios; o de otro modo desacreditarle, menospreciarle o deshonrarle, . . . ."

Para que exista libelo a los efectos de la acción en daños que concede esta ley, es preciso que la difamación sea maliciosa. Pero la ley presume que hay malicia en cualquier comunicación o escrito infamatorio o calumnioso dirigido a otra persona que no sea un pariente dentro del tercer grado, o a una persona a quien el tutor tenga bajo tutela, o cuando dicha comunicación se cruce entre personas que tengan negocios en sociedad, u otra asociación semejante. Sec. 5, Ley de 1902, 32 L.P.R.A. sec. 3145. La doctrina ha establecido que en libelo la imputación pública hecha a una persona de que ha cometido delito penable es infamatoria por su propia naturaleza. En tal caso, y a menos que caiga dentro de la excepción mencionada en la Sec. 5, la ley presume que la publicación se hizo con malicia, o sea, que hay libelo. La Ley de 1902 también establece en la Sec. 4, 32 L.P.R.A. sec. 3144, que no se presumirá maliciosa la publicación hecha en un informe justo y verdadero de un procedimiento judicial, legislativo u otro procedimiento cualquiera, o de algo dicho en el curso de dichos procedimientos. En tal caso la ley no presume malicia en la publicación y la malicia deberá ser probada con evidencia independiente de la publicación misma, si se desea obtener daños bajo dicho estatuto. *Romany* v. *El Mundo, Inc.,* 89 D.P.R. 604, 615–616 (1964). Véanse, además, *Caraballo* v.

*P.R. Ilustrado, Inc.,* 70 D.P.R. 283 (1949) ; *Moraza* v. *Rexach Sporting Corp.,* 68 D.P.R. 468 (1948) ; *Las Monjas Racing Corp.* v. *Puerto Rico Ilustrado,* 58 D.P.R. 931 (1941) ; *Casanova* v. *González Padín,* 47 D.P.R. 488 (1934) ; *Quiñones* v. *J. T. Silva Banking & Commercial Co.,* 16 D.P.R. 696 (1910) ; *Jiménez* v. *Díaz Caneja,* 14 D.P.R. 9 (1908).

En *Bosch* v. *Editorial El Imparcial, Inc.,* 87 D.P.R. 285 (1963), al discutir las doctrinas aplicables al libelo publicado en un periódico, dijimos que la publicación que imputa la comisión de un delito se considera libelosa *per se* y, por lo tanto, no exige alegación ni prueba especial de daños; que el que publica un libelo realizado por otro es a su vez responsable de tal libelo; que, aunque el libelo sea aparente de la faz de la información, la publicación de ésta puede que no dé base para una acción de libelo por ser la publicación privilegiada de acuerdo con las Secs. 4 y 5 de nuestra ley sobre libelo; que la cuestión de privilegio es puramente estatutaria y que dicha defensa es más restrictiva en Puerto Rico que en otras jurisdicciones que han adoptado la regla de la ley común.

La información publicada por El Día no goza de dicho privilegio. En *Caraballo* v. *P.R. Ilustrado, Inc.,* supra, sostuvimos que un periódico disfruta del privilegio condicional de publicar el contenido de los asientos en el Libro de Novedades de la Policía, sujeto a la condición de que lo publicado sea una relación razonable y verídica de lo contenido en el Libro de Novedades. El periódico El Día publicó una información muy distinta a lo contenido en el informe de la Policía; la publicación no era una relación verídica ni provenía del Libro de Novedades.

Tampoco goza la publicación del privilegio que se establece en la Sec. 5. La Legislatura creó en la Sec. 5 un privilegio restringido para comunicaciones, sólo bajo cuatro clases de circunstancias (*Díaz* v. *P.R. Ry., Lt. & P. Co.,* supra, a la pág. 815), ninguna de las cuales está presente en este caso. No estando cobijada bajo ni uno ni otro privilegio, la publica-

ción del periódico está cubierta por la presunción de malicia de la Sec. 5 de la Ley de Libelo.

■ Sostiene el recurrente que la presunción establecida por la Sec. 5 de la Ley de Libelo es nula e inconstitucional— y en ello coincide con la posición de Prensa Asociada—y cita los casos de *Tot* v. *United States*, 319 U.S. 463 (1943), y *Western R.R. Co.* v. *Henderson*, 279 U.S. 379 (1929); *Mobile* v. *Turnipseed*, 219 U.S. 35 (1940); *McFarland* v. *American Sugar Ref. Co.*, 241 U.S. 79 (1916); y *Leary* v. *United States*, 395 U.S. 6 (1968).

■ La presunción que establece la Sec. 5 de la Ley de Libelo y Calumnia lo que hace efectivamente es eliminar la malicia expresa o real como elemento de libelo y calumnia, excepto en las situaciones señaladas en la Sec. 4 y las también señaladas por excepción en la Sec. 5. La presunción de malicia tiene el mismo efecto que el decir que no es requisito la malicia expresa o real en el caso de manifestaciones o publicaciones libelosas que no están amparadas por alguno de los privilegios señalados en las Secs. 4 y 5. Esto es en realidad un precepto de derecho sustantivo expresado en forma de presunción. 9 Wigmore, *On Evidence*, sec. 3492, 3ra. ed., pág. 292.

La presunción de malicia de nuestra Ley de Libelo es distinguible de las presunciones aplicadas en los casos citados por la parte recurrente. En *Tot*, supra; *Leary*, supra; y *United States* v. *Romano*, 382 U.S. 136 (1965), se trataba de presunciones estatutarias supuestamente rebatibles a ser aplicadas en ciertos procesos criminales. Estas presunciones violaban la cláusula del Debido Proceso, violando así los derechos del acusado. Sin embargo, el Tribunal Supremo de los Estados Unidos sostuvo la constitucionalidad de presunciones similares en los casos de *Barnes* v. *United States*, 93 S.Ct. 2357 (1973), 41 L.W. 4917 (18 de junio de 1973); *Turner* v. *United States*, 396 U.S. 398 (1970); y *United States* v. *Gainey*, 380 U.S. 63 (1963).

■ Son igualmente diferenciables las presunciones aplicadas en los demás casos citados por la recurrente. En el caso de autos la presunción aplicada es realmente una regla de derecho sustantivo que ha de aplicarse como cualquier otra regla de derecho. Véanse *Ellis* v. *Henderson*, 204 F.2d 173, *cert. den.* 346 U.S. 873 (1954); *United States* v. *Provident Trust Co.*, 291 U.S. 272 (1934).

La única limitación constitucional que le ha sido impuesta a la legislación de Libelo y Calumnia de los estados es la que se desarrolló alrededor del privilegio restringido del comentario imparcial sobre asuntos públicos. La defensa del comentario imparcial se originó en el derecho común como un privilegio restringido, pero el Tribunal Supremo Federal le dio carácter constitucional bajo la Primera Enmienda. *New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964).

Con anterioridad al 1964, los medios noticiosos podían comentar la conducta de los funcionarios públicos con inmunidad, siempre que el comentario estuviera basado en hechos ciertos que justificaran el comentario. La información debía ser imparcial y exacta. El privilegio no cubría el informe falso de los hechos, ni la inclusión de materia difamatoria. El peso de la prueba recaía sobre el demandado en primera instancia de probar la existencia de una ocasión privilegiada para la publicación mediante prueba de un reconocido interés público o privado que justificara la publicación. Establecido el privilegio, el peso recaía sobre el demandante de probar que se había abusado del mismo mediante publicación excesiva o mediante el uso de la ocasión para un propósito impropio. Para una discusión de este privilegio antes de *New York Times*, véase *Bosch* v. *Editorial El Imparcial, Inc.*, supra, págs. 306–313. (5)

---

(5) "[L]a designación del comentario imparcial como un privilegio se presta a confusión especialmente en una jurisdicción como la nuestra donde se ha resuelto que la única fuente de publicación privilegiada es estatutaria. Lo cierto es que la defensa del comentario imparcial proviene

En *New York Times*, supra, el Tribunal Supremo Federal abolió las doctrinas anteriores y determinó que la publicación de un informe falso o comentarios injustificados referentes a la conducta oficial de un oficial público estaban inmunes de reclamaciones por libelo y gozaban de un privilegio restringido, a menos que la información fuera publicada intencionalmente y con grave menosprecio de la determinación de si la misma era o no falsa. Sostuvo el Tribunal Supremo, a las págs. 279 y 280:

"Las garantías constitucionales requieren, nos parece, una norma federal que prohiba a un oficial público el recuperar daños por una manifestación difamatoria relacionada con su conducta oficial, a menos que pruebe que la manifestación fue hecha con 'malicia real', esto es, con conocimiento de que era falsa o con grave menosprecio de si era falsa o no." (Traducción nuestra.)

El Tribunal Supremo no declaró inconstitucional la presunción de malicia, sino que determinó que en ese caso existía un privilegio que gozaba de protección constitucional y procedía probar malicia real o expresa, igual que en los demás privilegios.

La decisión de *New York Times*, supra, se ha ido extendiendo rápidamente. El Tribunal Supremo la aplicó a procedimientos por libelo criminal. *Garrison* v. *Louisiana*, 379 U.S. 64 (1964); lo extendió y lo hizo aplicable a todo empleado público, *Rosenblatt* v. *Baer*, 383 U.S. 75 (1966); *Pape* v. *Time, Inc.*, 354 F.2d 558 (7th Cir. 1965), *cert. den.* 384 U.S. 909.([6])

---

del derecho constitucional de libertad de palabra y de prensa limitado por el derecho de toda persona a protección contra ataques abusivos a su honra, reputación y a su vida privada o familiar. Secs. 4, 8, Art. II, Constitución de Puerto Rico. (1 L.P.R.A. pp. 187 y 189.) Difiere, por lo tanto, de la defensa de privilegio, pues puede invocarse por cualquier individuo, periódico o revista y puede usarse siempre y cuando el comentario esté basado en hechos de interés público."

([6]) El requisito de malicia y su definición fue discutido en *Henry* v. *Collins*, 380 U.S. 356 (1965); *St. Amant v. Thompson*, 390 U.S. 727 (1968).

En *Time, Inc.* v. *Hill*, 385 U.S. 374 (1967), extendió el privilegio constitucional a una acción basada en el derecho a la intimidad promovida por demandantes que no eran oficiales públicos. En los casos germanos de *Curtis Publishing Co.* v. *Butts* y *Associated Press* v. *Walker*, 388 U.S. 130 (1967), se extendió la doctrina de *New York Times*, supra, a "figuras públicas" y "noticias". Véase sobre esto a *Aponte Martínez* v. *Lugo*, 100 D.P.R. 282 (1971).

En *Associated Press* v. *Walker*, supra, el Tribunal Supremo extendió el privilegio para cubrir a un general retirado que había llamado la atención pública por su activismo político al tomar una posición beligerante y controversial frente al ojo público. En este caso la naturaleza del reportaje—un parte noticioso enviado por una agencia de noticias sobre una revuelta en un campus universitario en protesta por la orden de un tribunal federal ordenando la matrícula de un estudiante negro que podía calificarse de *hot news* influenció al tribunal. Pero en el caso de *Butts*, supra, donde no existía ese elemento, el Tribunal Supremo aplicó el privilegio a una información publicada en una revista ·sobre un *coach* de un equipo de fútbol que no era empleado público, a quien se le imputaba haber "arreglado" un juego. Con estas decisiones, se extendió la inmunidad de el "privilegio restringido" de *New York Times* a las "figuras públicas". Para un análisis de las decisiones de *Hill*, supra, *Butts*, supra, y *Walker*, supra, puede verse Kalven, *The Reasonable Man and The First Amendment: Hill, Butts and Walker*, 1967 Sup. Ct. Rev. 267.

Después de *Butts* y *Walker*, supra, los tribunales inferiores comenzaron a enfatizar el interés legítimo del público sobre la materia en lugar de la persona del demandante. *Time, Inc.* v. *McLaney*, 406 F.2d 565 (5th Cir.) *cert. den.* 395 U.S. 922 (1969); *Bon Air Hotel* v. *Time, Inc.*, 426 F.2d 858 (5th Cir. 1970).

El Tribunal Supremo consideró nuevamente la aplicación de la garantía de libertad de prensa de la Primera Enmienda

y su privilegio restringido en *Rosenbloom* v. *Metromedia, Inc.,* 403 U.S. 29 (1971).

■ La cuestión a resolverse en *Rosenbloom,* supra, era si la norma de *knowing-or-reckless falsity* de *New York Times,* supra, según expandida en *Butts,* supra, aplicaba a una acción civil de libelo instada por quien no era ni un "oficial público" ni una "figura pública", sino una persona privada reclamando por unos informes falsos y difamatorios hechos por una estación de radio, referentes a su participación en un evento de interés público o general.(7) El Tribunal Supremo extendió la regla del "privilegio restringido" para incluir a una persona privada involucrada en una cuestión de interés público o general, siempre y cuando el comentario o publicación no se haya hecho con malicia expresa (*actual malice*), o sea, con conocimiento o grave menosprecio de su falsedad (*with knowing or reckless falsity*).(8)

---

(7) Ver: Note: *Media Privilege to Report Events of Public Interest,* 85 Harv. L. Rev. 222 (1971); Note, 40 Fordham L. Rev. 651 (1971–72); Keeton, *Some Implications of the Constitutional Privilege to Defame,* 25 Vand. L. Rev. 59 (1972).

(8) Dijo el Tribunal Supremo:

"If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety. . . . We honor the commitment to robust debate on public issues, which is embodied in the First Amendment, by extending constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous . . . .

"[I]t is clear that there has emerged from our cases decided since *New York Times* the concept that the First Amendment's impact upon state libel laws derives not so much from whether the plaintiff is a 'public official', 'public figure' or 'private individual', as it derives from the question whether the allegedly defamatory publication concerns a matter of public or general interest . . . . In that circumstance we think the time has come forthrightly to announce that the determinant whether the First Amendment applies to state libel actions is whether the utterance involved

■ En resumen, el Tribunal Supremo Federal hace aplicable el requisito de malicia expresa únicamente a los casos en que se determine que se estaba informando sobre un evento o tema de interés público o general. No señaló una doctrina absolutista.(⁹) De determinarse que el evento informado no es de interés general, no tiene el periódico privilegio que lo proteja y la publicación tal como fue hecha haría responsable al demandado bajo nuestra Ley de Libelo. y Calumnia.

■ ¿Cuáles son los eventos o temas de "interés público" o general a los cuales le aplica la doctrina de *New York Times?* Se ha determinado que constituyen eventos de interés público: la apertura de una obra teatral basada en hechos reales, *Time, Inc.* v. *Hill*, supra; el alegado "arreglo" del resultado de un juego de fútbol, *Butts*, supra; los eventos y personalidades envueltos en los esfuerzos del gobierno federal de hacer cumplir una orden de un tribunal ordenando el ingreso de un estudiante negro a la Universidad de Mississippi, *Associated Press* v. *Walker*, supra; eventos deportivos, *Time, Inc.* v. *Johnston*, 448 F.2d 378 (1971); la moralidad y la religión, *Gospel Spreading Church* v. *Johnson Pub. Co.*, 14 U.S. App. D.C. 207, 454 F.2d 1050 (1971); *Spern* v. *Time, Inc.*, 324 F.Supp. 1201 (W.D. Pa. 1971); las ciencias, *United Med. Laboratories, Inc.* v. *C.B.S.*, 404 F.2d 706 (9th Cir. 1968); el crimen organizado, *Cerrito* v. *Time, Inc.*, 449 F.2d 306 (9th Cir., 1971); *Time, Inc.* v. *Ragano*, 427 F.2d 219 (5th Cir. 1970); un crimen famoso, *De Salvo* v. *20th Century Fox*, 300 F.Supp. 724 (1969); la corrupción de un oficial del

concerns an issue of public or general concern, albeit leaving the delineation of the reach of that term to future cases." *Rosenbloom*, supra, a las págs. 43–45.

(⁹) "We are not to be understood as implying that no area of a person's activities falls outside the area of public or general interest. We expressly leave open the question of what constitutional standard of proof, if any, controls the enforcement of· state libel laws for defamatory falsehoods published or broadcast by media about a person's activities not within the area of public or general interest." *Rosenbloom*, supra, nota al calce, pág. 44.

gobierno, *Cervantes* v. *Time, Inc.*, 464 F.2d 986 (8th Cir., 1972); una campaña policíaca contra la obscenidad, *Rosenbloom*, supra; el espionaje electrónico, *Firestone* v. *Time, Inc.*, 460 F.2d 712 (5th Cir. 1972); un doble asesinato, *Mistrot* v. *True Detective Publishing Corporation*, 467 F.2d 122 (1972).([10])

Por otro lado, los tribunales no han concedido el privilegio a publicaciones privadas que informan sobre la reputación comercial y de crédito de corporaciones o individuos, por entender que estos informes no son de interés público. *Grove* v. *Dunn & Bradstreet*, 438 F.2d 433 (1971), *cert. den.* 404 U.S. 898 (1971); *Kansas Electric Supply Co., Inc.* v. *Dun & Bradstreet, Inc.*, 448 F.2d 647 (1971); *Hood* v. *Dun & Bradstreet, Inc.*, CA, 5th Cir., September 14, 1973. El divorcio de dos personas prominentes, aunque de valor noticioso (*newsworthy*), no convertía los informes publicados en los periódicos en materia protegida constitucionalmente por no ser de importancia o consecuencia pública o general (*real public or general concern*). *Firestone* v. *Time, Inc.*, 271 So.2d 745 (Fla. 1972).

Es de interés público el que se hagan cumplir las leyes y se procese a quienes las infringen. La existencia de una alta criminalidad es de importancia y consecuencia para el público en general, pero no todos los informes de la Policía de Puerto Rico son de interés público. Diariamente se producen muchos eventos que son llevados a la atención de la policía. Aunque no se trate de un acto delictivo, la policía tiene que rendir un informe y no por eso se convierten en eventos de interés público. La criminalidad que llama la atención y preocupación

---

([10]) Han sido considerados de interés público: el arresto de un acusado de participar en una red mundial de contrabando de narcóticos, *Miller* v. *News Syndicate Co., Inc.*, 445 F.2d 356 (2d. Cir. 1971); la imputación de brutalidad policíaca a un capitán de la policía, *Thuma* v. *Hearst Co.*, 340 F.Supp. 867 (1972); el arresto por expedir un cheque sin fondos conectado erróneamente a una serie de hurtos y la recuperación de los artículos hurtados, *Vinci* v. *Gannet Co., Inc.*, 335 N.Y.S.2d 738 (1972).

del público en general es la producida por el crimen organizado, las drogas y los hurtos en gran escala y todos aquellos delitos que afectan la sociedad en general. Una disputa familiar, aunque produzca una muerte desgraciada, no tiene más importancia o consecuencia para el público puertorriqueño que la que le asigna el editor de un periódico al publicarlo en las páginas interiores junto con otras muchas noticias misceláneas y sin importancia, tal como se hizo en este caso. El interés generado por los hechos informados por la policía y reseñados en El Día no iba más lejos que el círculo de vecinos, amigos y familiares de la familia Chico-Ramos.

El periódico El Día trata de excusarse en el hecho de que la información fue diseminada por una agencia noticiosa, Prensa Asociada, y que el periódico la repitió sin malicia alguna, bajo la creencia de que la información era correcta.

No tiene razón. La buena fe del que publica un libelo no lo releva de la responsabilidad legal por la publicación. La doctrina general sostiene que la publicación de una información difamatoria o libelosa por un periódico no está privilegiada por el hecho que haya sido copiada de otra publicación. Aunque con algunas excepciones,([11]) la mayoría de los tribunales sostienen que el que la noticia haya venido por los canales normales de recolección de noticias o agencias noticiosas, sin que pudiese conocerse su falsedad, el periódico que la publica y repite es responsable para con la persona difamada a menos que exista otra justificación legal reconocida. *Sacco* v. *Herald Statesman Co.*, 223 N.Y.S.2d 329 (1961); *Graiepy* v. *Pearson*, 104 F.Supp. 681 (1952); *Carey* v. *Hearst Publications*, 143 P.2d 857 (1943); *Wood* v. *Constitution Pub. Co.*, 57 Ga. App. 123, 194 S.E. 760 (1937); *Slazay* v. *New York American*, 254 App. Div. 249, 4 N.Y.S.2d 620 (1938); *Louisville Times Co.* v. *Lyttle*, 257 Ky. 132, 77 S.W.2d 432 (1935); *Oklahoma Pub. Co.* v. *Givens*, 67 F.2d 62

---

([11])*MacGregor* v. *Miami Herald Publishing Co.*, 119 So.2d 85 (Fla. 1960); *Layne* v. *Tribunal Co.*, 108 Fla. 177, 146 So. 234 (1933).

(10th Cir. 1933). Véanse Harper & James, *The Law of Torts*, Vol. I, 1956, sec. 5.18, pág. 404; Thayer, *Legal Control of the Press*, 4th ed. (1962), págs. 279–283; Prosser, *The Law of Torts*, 4th ed. (1971), sec. 113, págs. 775–776.

██ En el caso de autos la noticia no proviene de ningún punto lejano, ni es de tal importancia que sea necesaria una publicación rápida. No hay razón alguna para no aceptar la doctrina mayoritaria y hacer responsable al periódico por la repetición de publicación libelosa. No se cometió el error señalado. Al no gozar la recurrente de la protección de ninguno de los privilegios enumerados por nuestra Ley de Libelo y Calumnia, ni del privilegio restringido reconocido por la Primera Enmienda, el demandante no tenía que probar malicia real o expresa. Actuó correctamente el tribunal recurrido al aplicar la presunción de malicia de la Sec. 5 de la Ley de Libelo. La malicia presumida era suficiente para sostener la reclamación del demandante. No se atenta contra la libertad de prensa al requerir que sus agentes actúen dentro del ámbito de la ley.

## II

Señala como error la recurrente el haberse declarado sin lugar su demanda de tercero dándole validez a una cláusula de exoneración contractual, la cual es nula.

El contrato suscrito entre El Día y Prensa Asociada contiene una cláusula de relevo de responsabilidad.([12]) En dicha cláusula Prensa Asociada se compromete a proporcionar un servicio exacto de noticias hasta donde le permitan sus mejores esfuerzos. Esta cláusula también dispone que Prensa Asociada no tendrá responsabilidad alguna, directa o indirectamente, por pérdida o daño alguno ocasionados a El Día o cualquier otra persona, firma o corporación, por razón de la publicación de cualquier material que Prensa Asociada supla mediante su servicio.

---

([12]) Ver escolio 1.

 Las cláusulas de exoneración no son favorecidas. En el pasado hemos repudiado las cláusulas contractuales dirigidas a exonerar *a priori*, a un contratante por los daños causados posteriormente al otro contratante por actos negligentes del primero. *Carrasquillo* v. *Am. Missionary Association*, 61 D.P.R. 867 (1943) ; *Cabrera* v. *Doval*, 76 D.P.R. 777 (1954) ; véase *Rivera* v. *San Juan Racing*, 90 D.P.R. 414 (1964) y también *Castro* v. *Supermercados de Descuentos*, 99 D.P.R. 851 (1971).

El Código Civil consagra la libertad de contratación, pero señala que la voluntad de los contratantes no puede ser contraria a las leyes, a la moral, ni al orden público. Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. El Art. 4 del mismo Código, 31 L.P.R.A. sec. 4 dispone que los derechos concedidos por las leyes son renunciables a no ser esta renuncia contra la ley, el interés o el orden público o en perjuicio de tercero.

 La renuncia de derechos autorizada por el Art. 4 del Código debe ser clara, terminante e inequívoca. Más aún debe ser esto así cuando se trate de convenios en los cuales se exonere de responsabilidad a una persona por sus futuros actos negligentes. *Cabrera* v. *Doval*, supra, a la pág. 780. Sostuvimos allí, al revocar una sentencia que declaró sin lugar una demanda de daños y perjuicios dictada en base a un relevo *a priori* de responsabilidad, que (a la pág. 781) :

"Como regla generalmente aceptada se establece la de que estos convenios sobre exoneración de responsabilidad no son favorecidos por la ley; [*citas*] ; y deben, por tanto, ser interpretados estrictamente en contra de la parte que descansa en ellos para liberarse de responsabilidad, y si posible, su interpretación debe ser contraria a la exoneración. [Citas]. Para que una parte quede exonerada de las consecuencias de su propia negligencia, el lenguaje usado en el documento de descargo debe indicarlo así, en forma clara y explícita. Algunas cortes sostienen, a nuestro juicio con buen sentido, que el lenguaje exculpando de responsabilidad por negligencia debe ser explícito, bien hacién-

dose referencia expresa a la negligencia o bien indicando tal intención en términos inequívocos. [citas]."

Véase, *Contractual Exculpation from Tort Liability in California—The True Rule Steps Forward*, 52 Calif. L. Rev. 350 (1964); 57 Am. Jur.2d, Negligence, sec. 28, págs. 372–373. Un factor importante en la determinación de la validez de una cláusula de relevo depende de la fuerza en la negociación de cada uno de los contratantes. Si no se encuentran en igualdad de condiciones y de fuerza, de manera que una parte se encuentra obligada a aceptar el relevo de responsabilidad por negligencia de la otra parte, el relevo es nulo. *Delta Airlines, Inc.* v. *Douglas Aircraft Company*, 47 Cal. Rptr. 518 (1966); *Henningsen* v. *Bloomfield Motors, Inc.*, 161 A.2d 69 (1960); *Donna* v. *Con Edison*, 337 N.Y.S.2d 772 (1972); *Kansas City Power & Light Co.* v. *United Tel. Co. of Kan.*, 458 F.2d 177 (1972).

Reconocida la doctrina general de libelo de que el que repite un libelo es tan responsable como el que lo originó y responde, independientemente de su buena fe, y le añadimos la situación poco poderosa de un periódico local que necesita de un servicio de noticias para poder subsistir, la conclusión es inevitable que cláusulas de exoneración como la aquí envuelta son contrarias al interés público y, por lo tanto, sin valor alguno. En consecuencia, concluimos que el juez sentenciador cometió error al exonerar a Prensa Asociada, frente a la demanda de tercero del periódico, en base a la referida cláusula de exoneración.

### III

El tribunal a quo también incidió al resolver que la Regla 12.1 de las de Procedimiento Civil impedía que Prensa Asociada fuera traída al pleito bajo la práctica de tercero.

El error es manifiesto. La Regla 12.1 dispone, *inter alia*, que "[e]l demandado podrá como demandante contra

tercero notificar un emplazamiento y demanda a una persona que no sea parte en el pleito y que le sea o pueda serle responsable *por toda* o parte de la reclamación del demandante . . . ." (Bastardillas nuestras.) La acción de tercero instada por el periódico fue formulada para hacer valer sus derechos de tipo *ex-contractu* contra Prensa Asociada; en otras palabras, su derecho a ser indemnizado por el daño—importe de la sentencia, etc. que viniera obligado a satisfacer al demandante —como consecuencia de haber Prensa Asociada suplido una noticia falsa para su publicación. *Vélez* v. *Halco Sales, Inc.*, 97 D.P.R. 438, 444–446 (1969) ; 3 Moore's *Federal Practice*, Secs. 14.8, 14.10, 14.11; Prosser, *ob. cit.*, págs. 310–313.

La recurrente impugna, por entender que es exagerada, la compensación determinada por el tribunal. Esta fue fijada en la suma de $5,000.00. En sus determinaciones de hecho, el juez recurrido concluyó:

"No hay duda de que los demandantes sufrieron angustias mentales con motivo de la falsedad y que Félix Chico Ramos y su esposa sufrieron humillaciones en el reducido grupo de puertorriqueños en que se desenvolvían en Nueva York, aunque la intensidad es incierta y es dudoso que la situación afectase a Chico Ramos en su trabajo en la forma en que alega. Se le dificultó la explicación sobre sus angustias porque hablaba el español con la sintaxis usada por lo que ahora se llama neoricans."

Es en verdad difícil fijar la cantidad de daños que procede en casos de esta naturaleza, y es por eso que mentes razonables pueden diferir sobre la suma fijada en el de autos. Pero, no habiendo la parte recurrente elevado la transcripción de evidencia y puesto en condiciones al Tribunal de hacer su propia evaluación y determinación independiente, no creemos que se justifique nuestra intervención para reducirla por ser la misma, como se alega, exageradamente alta.

En virtud de lo anteriormente expresado, *se confirmará la sentencia dictada por el Tribunal Superior, Sala de Huma-*

*cao, que declaró con lugar la demanda; y se revocará aquella parte de la misma que desestimó la demanda de tercero instada por la parte recurrente y, en su lugar, se dictará otra declarando con lugar dicha demanda de tercero y condenando a la tercera demandada Associated Press (Prensa Asociada) a satisfacer a la parte recurrente (demandados en el pleito original) el importe total que ésta venga obligada a satisfacer a los demandantes, más las costas del proceso y la suma de quinientos dólares ($500) por concepto de honorarios de abogado de la parte recurrente.*

El Juez Asociado, Señor Rigau, no intervino.